26CV005303-590

STATE OF NORTH CAROLINA

COUNTY OF MECKLENBURG

EMAGE MEDICAL, LLC,

     Plaintiff,

v.

INSIGHT INNOVATION PARTNERS, LLC
and CARI RAY.

     Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
26CV_____

**COMPLAINT**

The Plaintiff EMAGE MEDICAL, LLC ("Emage") complains of the Defendants INSIGHT INNOVATION PARTNERS, LLC ("Insight") and CARI RAY ("Ms. Ray") as follows:

1. Emage is a North Carolina corporation with its principal place of business located in Mecklenburg County, North Carolina.

2. Upon information and belief, Insight is a South Carolina corporation that does business in North Carolina.

3. Upon information and belief, Ms. Ray is a citizen and resident of South Carolina.

4. Emage's founder, Lonnie Roy Wallace ("Mr. Wallace"), incorporated Emage in 2008.

5. Since its incorporation, Emage has been in the business of distributing aesthetic medical supplies.

6. Emage first employed Ms. Ray to act as a salesperson on November 1, 2019, pursuant to an independent contractor agreement (the "First Ray ICA").

7. A true copy of the First Ray ICA is attached hereto as **Exhibit "A"** and incorporated herein by reference.

8. The First Ray ICA contained a set of restrictive covenants that precluded her from competing with Emage, soliciting Emage employees and soliciting Emage's customers (the "Emage Customers") and Emage's suppliers (the "Emage Suppliers").

9. The First Ray ICA also contained a confidentiality provision that restricted Ms. Ray's use or disclosure of Emage's confidential information (the "Emage Confidential Information").

1

10. Although Ms. Ray lived in South Carolina, she often worked from Emage's Charlotte offices.

11. The Emage Customers were and are located throughout the country.

12. Ms. Ray visited the Emage Customers both virtually and in person.

13. Some of the Emage Customers that Ms. Ray personally visited were located in North Carolina.

14. In 2021, Mr. Wallace engaged a business broker, Viking Acquisitions, LLC ("Viking") to conduct an estimate of what Emage would be worth if he were to sell it.

15. Viking advised Mr. Wallace that Emage could be sold for $2.3MM (the "Viking Estimate").

16. Ms. Ray, aware that Mr. Wallace was considering selling Emage, offered to purchase the company for $800,000.00. Given that Ms. Ray's offer was well below the Viking Estimate, Mr. Wallace rejected it.

17. In response, Ms. Ray proposed to purchase equity in Emage and begin acting as chief executive officer ("CEO").

18. In mid-2022, Emage and Ms. Ray reached a verbal agreement (the "First Verbal Agreement") under which:

    a. Ms. Ray would pay Emage $100,000.00 for a percentage of its equity.

    b. Ms. Ray would begin acting as CEO in September of 2022.

    c. Emage would provide Ms. Ray 7% of its equity in addition to what she was to purchase for $100,000.00.

    d. Ms. Ray would have a first right of refusal if Mr. Wallace decided to sell the remaining equity in Emage.

19. Emage retained attorney Brandy Milazzo ("Ms. Milazzo") in the Summer of 2022 to reduce the First Verbal Agreement to writing (the "Equity Purchase Agreement") and negotiate its terms with Ms. Ray.

20. After Emage approved of Ms. Milazzo's draft of the Equity Purchase Agreement, Ms. Milazzo presented it to Ms. Ray for her review and approval.

21. Ms. Ray declined to execute the Equity Purchase Agreement, her stated reason being that she did not wish to become an employee of Emage rather than an independent contractor.

2

22. After Ms. Ray declined to execute the Equity Purchase Agreement, Emage and Ms. Ray reached a second verbal agreement (the "Second Verbal Agreement"), under which:

    a. Mr. Ray would begin to run day to day operations of Emage as CEO on September 1, 2022.

    b. Mr. Wallace would semi-retire.

    c. Beginning in September of 2022, Emage would pay Ms. Ray a consulting fee of $1,000.00 per week, an increased commission schedule and 7% of net profits distributed quarterly.

23. On September 1, 2022, Ms. Ray did begin serving as CEO of Emage and Emage did begin paying her $1,000.00 per week, an increased commission schedule and 7% of net profits.

24. After Ms. Ray became the CEO, gross sales and net profits of Emage began to markedly decrease.

25. When confronted by Mr. Wallace about the decrease, Ms. Ray declined to take responsibility or reverse it.

26. Throughout 2023, Emage's sales and profits continued to decline.

27. Due to the great decrease in sales and profit, in January of 2024, Emage and Ms. Ray verbally agreed that she would return to the original compensation schedule in the First Ray ICA.

28. In January of 2024, Mr. Wallace returned to managing day to day operations and Ms. Ray returned to her original sales role.

29. On January 13, 2025, Emage and Ms. Ray executed a new independent contractor agreement (the "Second Ray ICA") that aligned with the sales role she had reassumed the previous year.

30. Emage's motivation in entering the Second Ray ICA was to incentivize Ms. Ray to hire more salespeople whom she would manage to increase Emage's revenues and profit.

31. A true copy of the Second Ray ICA is attached hereto as **Exhibit "B"** and incorporated herein by reference.

32. The the First Ray ICA, the Second Ray ICA contained a set of restrictive covenants (the "NCAs") that precluded her from competing with Emage, soliciting Emage employees and soliciting the Emage Customers and the Emage Suppliers.

33. Like the First Ray ICA, the Second Ray ICA also contained a confidentiality provision (the "Confidentiality Provision") that restricted Ms. Ray's use or disclosure of the Emage Confidential Information.

34. Ms. Ray did not hire more salespeople and increase Emage's revenues and profits.

## FDA VIOLATIONS

35. Because it sells medical devices, Emage is subject to the authority of the Federal Drug Administration (the "FDA").

36. The FDA conducts short-notice inspections to ensure companies like Emage comply with federal regulations.

37. In March of 2023, while Ms. Ray was acting as CEO, the FDA conducted a short-notice inspection of Emage that resulted in the issuance of several notices of noncompliance (collectively, the "FDA Violations").

38. The FDA Violations resulted from Emage's failures to have adequate processes in place to comply with FDA regulations under Ms. Ray's tenure as CEO.

39. After receipt of the FDA Violations, Ms. Ray promise Mr. Wallace that she would oversee the corrective action (the "Corrective Actions") necessary to bring Emage into FDA compliance.

40. Ms. Ray represented to Mr. Wallace that it would require an additional four hours per day of her time to institute the Corrective Actions.

41. In response, Mr. Wallace agreed to significantly increase Ms. Ray's compensation and to hire her son to help her.

42. In July of 2023, Mr. Wallace began having weekly meetings with Ms. Ray to ensure that she was performing the Corrective Actions.

43. At each meeting, Ms. Ray represented to Mr. Wallace that she was progressing with the Corrective Actions and would complete them by the deadline set by the FDA.

44. In December of 2023, Ms. Ray told Mr. Wallace that she had provided Emage employee Suzi Hinkle ("Ms. Hinkle") with the documentation necessary to fully implement the Corrective Actions.

45. In January of 2024, Mr. Wallace learned from Ms. Hinkle that Ms. Ray had never provided Ms. Hinkle with said documentation.

46. Concerned, Mr. Wallace conducted an inspection of Ms. Ray's files and found that that despite her repeated assurances, Ms. Ray had made no progress toward the completion of the Corrective Actions.

4

47. Realizing that Ms. Ray could not, or would not, perform the Corrective Actions, Mr. Wallace asked his wife Lauren Wallace ("Ms. Wallace) to take over the task.

48. In order to meet the compliance deadlines set by the FDA, Ms. Wallace was forced to hire a consultant to help her perform the Corrective Actions.

49. In September of 2024, the FDA conducted a re-inspection of Emage and cited multiple issues of non-compliance under the FDA Violations that Ms. Wallace and her consultant were not able to correct prior to the inspection.

50. As a result, Emage had to increase the amount of its consultant's hours, at a cost exceeding $200,000.00, in order to perform the Corrective Actions.

**Fraudulent Medical Device**

51. In mid-2023, while serving as CEO, Ms. Ray represented to Mr. Wallace that she had discovered a medical device manufactured in China called the "Cytopeel", that she believed would be a profitable product for Emage to sell.

52. The Cytopeel is a device that cleans, exfoliates, and hydrates the skin.

53. Ms. Ray told Mr. Wallace that a Chinese company called ADSS manufactured the Cytopeel.

54. Ms. Ray told Mr. Wallace that her contact with ADSS was a Chinese citizen who purported to represent ADSS (the "Chinese Representative").

55. Mr. Wallace was suspicious of the Chinese Representative because he had a gmail account rather than a business email account.

56. To allay his suspicions, Mr. Wallace asked Ms. Ray to verify that the Chinese Representative did in fact represent ADSS and that ADSS was in fact the manufacturer of the Cytopeel that Ms. Ray wanted Emage to sell.

57. In response, Ms. Ray represented to Mr. Wallace that she had verified with ADSS that the Chinese Representative was employed by ADSS and that ADSS was the manufacturer of the Cytopeel.

58. In reliance upon Ms. Ray's representations, Mr. Wallace approved the purchase and distribution of the Cytopeel by Emage.

59. Without Mr. Wallace's knowledge or authority, Ms. Ray purchased supplies (the "Cytopeel Supplies") for the Cytopeel at great expense and in far greater quantity than was needed to service potential purchases of the device.

60. Ultimately, Emage sold fifty-one Cytopeels to Emage Customers.

5

61. Purchasers of the Cytopeel began complaining that the devices were not functioning properly.

62. Emage contacted the Chinese Representative for help with the malfunctioning Cytopeels.

63. Despite repeated requests from Emage, the Chinese Representative failed and refused to provide Emage with service and parts manuals for the Cytopeels that Emage needed to service the devices.

64. After an investigation, in February of 2025, Mr. Wallace learned that ADSS was not the manufacturer of the Cytopeel and that documentation provided by the Chinese Representative to induce their purchase was not authentic.

65. Upon information and belief, Ms. Ray knew that the ADSS was not the manufacturer of the Cytopeel and that the Chinese Representative was not an authorized representative of ADSS.

66. Alternatively, Ms. Ray acted negligently or recklessly by failing to investigate the Chinese Representative thoroughly.

67. Upon information and belief, Ms. Ray's motivation in making misrepresentations to Emage and Mr. Wallace about the Cytopeel was to earn a 7.5% commission and 10% of the profits on each unit sold.

68. As a result of Ms. Ray's actions, Emage:

    a.  Has been forced to purchase authentic Cytopeels from ADSS to replace the fifty-one fake units purchased through the Chinese Representative, at a cost of $218,025.00.

    b.  Has not been able to recover its expenditures for the Cytopeel Supplies, resulting in a loss of $36,666.31.

    c.  Has incurred severe damage to its reputation with the Emage Customers.

### Violation of Restrictive Covenants

69. Upon discovery of the scope of Ms. Ray's misrepresentations regarding the fake Cytopeels, Mr. Wallace directed Ms. Milazzo to terminate the Second Ray ICA.

70. On February 21, 2025, Ms. Milazzo sent Ms. Ray a termination letter (the "Termination Letter").

71. A true copy of the Termination Letter is attached hereto as **Exhibit "C"** and incorporated herein by reference.

6

72. Among other things, the Termination Letter advised Ms. Ray that she remained subject to the NCAs and the Confidentiality Provision set forth in the Second Ray ICA.

73. Upon information and belief, upon her receipt of the Termination Letter, Ms. Ray accessed Emage's confidential data base to download several items specifically defined as Confidential Information in the Confidentiality Provision of the Second Ray ICA, including: financial, operational, personnel, sales, marketing, customer lists, and pricing information.

74. Under the Confidentiality Provision, Ms. Ray is restricted from using the Confidential Information for her personal benefit.

75. Upon information and belief, Ms. Ray formed Insight on March 31, 2025, a month after she received the Termination Letter.

76. On or about May 13, 2025, Ms. Ray sent a solicitation blast email (the "Blast Email") to all of the Emage Customers on behalf of Insight.

77. A true copy of the Blast Email is attached hereto as **Exhibit "D"** and incorporated herein by reference.

78. On May 14, 2025, Ms. Wallace was notified that Ms. Ray had attempted to log onto Emage's customer relationship management system (the "CRM").

79. A true copy of the notice received by Ms. Wallace is attached hereto as **Exhibit "E"** and incorporated herein by reference.

80. Upon information and belief, the foregoing is only one of several attempts made by Ms. Ray to obtain further Confidential Information since she received the Termination Letter.

81. Upon information and belief, through and with Insight, Ms. Ray:

    a. Has solicited the business of some or all of the Emage Customers.

    b. Has solicited the business of some or all of the Emage Suppliers.

    c. Has engaged Emage's chemist to replicate Emage's products and sell them through Insight.

    d. Is selling the same products that Emage sells, using the Confidential Information to undercut Emage's prices.

    e. Is directly competing with Emage.

7

82. The foregoing actions of Ms. Ray and Insight are in direct violation of the NCAs and Confidentiality Provision contained in the Second Ray ICA.

83. Insight is vicariously liable for the actions of Ms. Ray through *respondeat superior*.

**FIRST CAUSE OF ACTION**
**(Breach of Contract—Second Verbal Agreement)**
***Against Ms. Ray***

84. The preceding allegations are incorporated herein by reference.

85. The Second Verbal Agreement is an enforceable contract between Ms. Ray and Emage.

86. Ms. Ray has breached the Second Verbal Agreement in the following ways, among others:

   a. Mismanaging Emage as CEO, resulting in drastic reductions its revenues and profits.

   b. Failing to properly perform the Corrective Actions required by the FDA.

   c. Participating intentionally, recklessly, or negligently in the scheme to purchase and sell the fraudulent Cytopeel to the Emage Customers.

   d. Purchasing the Cytopeel Supplies.

87. As a result of Ms. Ray's breach of the Second Verbal Agreement, Emage has incurred incidental, direct, and consequential damages including lost profit in a sum exceeding $25,000.00.

**SECOND CAUSE OF ACTION**
**(Breach of Contract—Second Ray ICA)**
***Against Ms. Ray and Insight***

88. The preceding allegations are incorporated herein by reference.

89. The Second Ray ICA is an enforceable agreement between Ms. Ray and Emage.

90. Ms. Ray has breached the Second Ray ICA in the following ways, among others:

   a. By violating the Confidentiality Provision.

   b. By violating the NCAs.

91. Insight is vicariously liable for the actions of Ms. Ray through *respondeat superior*.

92. As a proximate result of Ms. Ray's breach of the Second Ray ICA, and/or her civil conspiracy with Insight to violate the NCAs and the Confidentiality Provision, Emage has incurred incidental, direct, and consequential damages including lost profit in a sum exceeding $25,000.00.

## THIRD CAUSE OF ACTION
### (Wrongful Interference with Contract Right)
### *Against Insight*

93. The preceding allegations are incorporated herein by reference.

94. The Second Ray ICA contains valid contract rights between Emage and Ms. Ray.

95. Insight had knowledge of the facts giving rise to the Emage's contract rights with Ms. Ray under the Second Ray ICA.

96. Insight intentionally induced Ms. Ray to breach her obligations to Emage under the Second Ray ICA.

97. Insight has benefited from Ms. Ray's breach of her obligations to Emage under the Second Ray ICA.

98. Insight's actions are without justification.

99. As a result of Insight's actions, Emage has incurred incidental, direct, and consequential damages including lost profit in a sum exceeding $25,000.00.

## FOURTH CAUSE OF ACTION
### (Fraud)
### *Against Ms. Ray*

100. The preceding allegations are incorporated herein by reference.

101. Ms. Ray made the following false representations (the "Misrepresentations") to Mr. Wallace and Emage:

   a. That she was performing the Corrective Actions required by the FDA in response to the FDA Violations.

   b. That the Chinese Representative was the authorized representative of ADSS.

   c. That ADSS was the manufacturer of the Cytopeel.

102. Upon information and belief, the Misrepresentations were reasonably calculated by Ms. Ray to deceive Mr. Wallace and Emage.

103.    Upon information and belief, Ms. Ray intended to deceive Mr. Wallace and Emage such that Emage would act upon the Misrepresentations.

104.    Mr. Wallace and Emage were in fact deceived by the Misrepresentations and acted upon them by authorizing Ms. Ray to sell the fake Cytopeels through Emage to the Emage Customers.

105.    Mr. Wallace and Emage acted reasonably in relying upon Ms. Ray's Misrepresentations.

106.    Emage has suffered damages proximately caused by Ms. Ray's Misrepresentations, including loss of profits, in a sum exceeding $25,000.00.

107.    Emage is entitled to an award of punitive damages against Ms. Ray pursuant to Chapter 1D of the North Carolina General Statutes.

## FIFTH CAUSE OF ACTION
### (Negligent Representation—*alternatively*)
### *Against Ms. Ray*

108.    The preceding allegations are incorporated herein by reference.

109.    In the course of her work with and for Emage, Ms. Ray supplied the following false information (the "False Information") to Mr. Wallace and Emage:

    a.  That she was performing the Corrective Actions required by the FDA in response to the FDA Violations.

    b.  That the Chinese Representative was the authorized representative of ADSS.

    c.  That ADSS was the manufacturer of the Cytopeel.

110.    Upon information and belief, Ms. Ray intended for Mr. Wallace and Emage to rely on the False Information.

111.    The False Information was in fact, false.

112.    Ms. Ray failed to exercise reasonable care or competence in obtaining and communicating the False Information to Mr. Wallace and Emage.

113.    Mr. Wallace and Emage justifiably relied upon the False Information.

114.    As a proximate cause of its reliance upon the False Information, Emage incurred financial damages in a sum exceeding $25,000.00.

## SIXTH CAUSE OF ACTION
### (Unfair Trade Practice)
### *Against Ms. Ray*

115.    The preceding allegations are incorporated herein by reference.

116.    Upon information and belief, Ms. Ray committed the following acts in violation of Chapter 75 of the North Carolina General Statutes:

      a.    Persuading Mr. Wallace to semi-retire by promising to act as Emage's CEO.

      b.    While acting as CEO, funneling the majority of Emage's profits to herself.

      c.    Deceiving Mr. Wallace about her performance of the Corrective Actions to harm Emage's reputation with the FDA.

      d.    Deceiving Mr. Wallace regarding the authenticity of the Cytopeel in order to make commissions.

      e.    Destroy Emage's reputation and goodwill in order to poach the Emage Customers and Emage Suppliers and enrich Insight.

117.    Ms. Ray's conduct was in commerce.

118.    Ms. Ray's conduct proximately caused injury to Emage's business.

119.    Insight is vicariously liable for the actions of Ms. Ray through *respondeat superior*.

120.    As a result of Ms. Ray's actions, Emage suffered actual damages, including but not limited to lost profit, in a sum exceeding $25,000.00.

121.    Emage is entitled to treble damage and an award of attorney fees pursuant to Chapter 75 of the North Carolina General Statutes.

**WHEREFORE**, Emage respectfully prays the Court:

1)    For judgment against Ms. Ray and Insight, jointly and severally, in a sum exceeding $25,000.00.

2)    For punitive damages pursuant to Chapter 1D of the North Carolina General Statutes.

3)    For treble damages and attorney fees pursuant to Chapter 75 of the North Carolina General Statutes.

4)    That the costs be taxed to Defendants.

11

5) That the matter be tried to a jury; and

6) For such other and further relief as the Court deems just and proper.

**TLG LAW**

/s/ Jordan M. LaTorre
Jordan M. LaTorre
David G. Redding
2907 Providence Road, Suite 303
Charlotte, North Carolina 28211
Tel. & Fax: (704) 900-2215
jlatorre@tlg-law.com
dredding@tlg-law.com
*Attorneys for Plaintiff*

# INDEPENDENT CONTRACTOR AGREEMENT

This Independent Contractor Agreement (this "Agreement") is made effective as of November 01, 2019, by and between Emage Medical LLC (the "Company"), with its principal place of business at 15720 Brixham Hill Avenue, Suite 300, CHARLOTTE, North Carolina, and Cari Cox Burke (the "Contractor"), of 1732 Kelley Lake Dr, York _____, South Carolina. In this Agreement, the party who is contracting to receive the services shall be referred to as "Company", and the party who will be providing the services shall be referred to as "Contractor."

**1. DESCRIPTION OF SERVICES.** Beginning on October 30, 2019, the Contractor will provide the following services (collectively, the "Services"):

- Sales Management to act as the Company's selling agent
- Periodic contact with current and future clients
- Visiting prospective and current clients in North Carolina and South Carolina
- Attending trade shows and sponsorship programs to acquire leads and promote Company's products and services
- Attend and participate in weekly Company meetings
- Supervision of sales personnel and distributors contracted by Company
- Marketing, recruitment, and promotion of Company's products and services
- Related duties and responsibilities as are customarily performed by a person acting as an independent contractor and as otherwise may, from time to time, be reasonably assigned to Contractor by the Company.

Furthermore, the Contractor has the right of control over how the Contractor will perform the services. The Company does not have this right of control over how the Contractor will perform the services.

**2. PAYMENT FOR SERVICES.** The Company will pay compensation to the Contractor for the Services. Payments will be made as follows:

$20 per hour for at least 30 hours per week of training, sales, and sales management, including calling, emailing, and visiting prospects and clients, plus commissions as follows:

- 3% commission on all StemFacial and Supply sales that are not originated or closed by Sales Manager, including CytoPen cartridges
- An additional 2% commission on all StemFacial and Supply sales originated or closed by sales personnel supervised by Sales Manager and resales from said clients
- 7.5% commission on new StemFacial and Supply sales originated or closed by Sales Manager and resales from said clients
- 10% commission on Equipment sales (ImagePro® and CytoPen®) originated or closed by Sales Manager.
- 10% of profits on any new product Sales Manager has assisted in at least 50% of its development during the Term of this agreement
- If agreed upon by both Parties, and at a percentage, details, and compensation to be determined, the Company may offer an equity position in the Company to the Contractor as of November 1, 2020.

No other fees and/or expenses will be paid to the Contractor, unless such fees and/or expenses have been approved in advance by the appropriate executive on behalf of the Company in writing. The Contractor shall be solely responsible for any and all taxes, Social Security contributions or payments, disability insurance, unemployment taxes, and other payroll type taxes applicable to such compensation.

**EXHIBIT**

A

**3. TERM/TERMINATION.** This Agreement may be terminated by either party upon 30 days' written notice to the other party. Furthermore, the Contractor has the ability to terminate this Agreement "at will."

**4. RELATIONSHIP OF PARTIES.** It is understood by the parties that the Contractor is an independent contractor with respect to the Company, and not an employee of the Company. The Company will not provide fringe benefits, including health insurance benefits, paid vacation, or any other employee benefit, for the benefit of the Contractor.

It is contemplated that the relationship between the Contractor and the Company shall be a non-exclusive one. The Contractor also performs services for other organizations and/or individuals. The Company has no right to further inquire into the Contractor's other activities.

During the Term of this Agreement, Company is authorized to use and reuse without additional compensation, Contractor's name, photograph, likeness, voice, and biographical information, and any reproduction or simulation thereof in any media now known or hereafter developed, for valid business purposes of the Company.

**5. COMPANY'S CONTROL.** The Company has no right or power to control or otherwise interfere with the Contractor's mode of effecting performance under this Agreement. The Company's only concern is the result of the Contractor's work, and not the means of accomplishing it. Except in extraordinary circumstances and when necessary, the Contractor shall perform the Services without direct supervision by the Company.

**6. PROFESSIONAL CAPACITY.** The Contractor is a professional who uses his or her own professional and business methods to perform services. The Contractor will receive specific training on StemFacial and ImagePro from the Company, but has not and will not receive training regarding how to perform the Services.

**7. EXPENSES PAID BY CONTRACTOR.** The Contractor's business and travel expenses are to be paid by the Contractor and not by the Company. Company will reimburse Contractor for air travel, hotel, and meals for trade shows, events, or prospective and current client visits outside of North Carolina and South Carolina when agreed upon by Company and Contractor in writing.

**8. OWNERSHIP OF SOCIAL MEDIA CONTACTS.** Any social media contacts, including "followers" or "friends," that are acquired through accounts (including, but not limited to email addresses, blogs, Twitter, Facebook, YouTube, or other social media networks) used or created on behalf of the Company are the property of the Company.

**9. CONFIDENTIALITY.** Contractor may have had access to proprietary, private and/or otherwise confidential information ("Confidential Information") of the Company. Confidential Information shall mean all non-public information which constitutes, relates or refers to the operation of the business of the Company, including without limitation, all financial, investment, operational, personnel, sales, marketing, managerial and statistical information of the Company, and any and all trade secrets, customer lists, or pricing information of the Company. The nature of the information and the manner of disclosure are such that a reasonable person would understand it to be confidential. The Contractor will not at any time or in any manner, either directly or indirectly, use for the personal benefit of the Contractor, or divulge, disclose, or communicate in any manner any Confidential Information. The Contractor will protect such information and treat the Confidential Information as strictly confidential. This provision shall continue to be effective after the termination of this Agreement. Upon termination of this Agreement, the Contractor will return to the Company all Confidential Information, whether physical or electronic, and other items that were used, created, or controlled by the Contractor during the term of this Agreement.

This Agreement is in compliance with the Defend Trade Secrets Act and provides civil or criminal immunity to any individual for the disclosure of trade secrets: (i) made in confidence to a federal, state, or local government official, or to an attorney when the disclosure is to report suspected violations of the law; or (ii) in a complaint or other document filed in a lawsuit if made under seal.

**10. NO RIGHT TO ACT AS AGENT.** An "employer-employee" or "principal-agent" relationship is not created merely because (1) the Company has or retains the right to supervise or inspect the work as it progresses in order to ensure compliance with the terms of the contract or (2) the Company has or retains the right to stop work done improperly. The Contractor has no right to act as an agent for the Company and has an obligation to notify any involved parties that it is not an agent of the Company.

Contractor does not have the authority to enter into any contracts on behalf of Company or bind Company to any obligation. In addition, all orders and sales booked by Distributor are subject to the acceptance and approval of Company in its sole discretion.

**11. RIGHT OF REPRESENTATION.** Nothing in this Agreement shall be construed to preclude the Company from selling, leasing or otherwise marketing any of the Company's Services and/or Products directly to any customer. Notwithstanding the foregoing, the Company reserves the right to place the Products with educational, research or similar institutions and practitioners for research and/or educational purposes, for which no commission shall be paid.

**12. RESTRICTIVE COVENANTS.** Contractor covenants and agrees that, during the Term, and for a period of one (1) year from the end of the Term, Contractor shall not engage or participate, directly or indirectly, as a principal, independent contractor, agent, employee, employer, consultant, advisor, sole proprietor, stockholder, partner, trustee, joint venture or in any other individual or representative capacity, in the conduct or management of, or own any stock or other proprietary interest in, or debt of, any business organization, person, firm, partnership, association, corporation, enterprise or other entity that shall be engaged in any business (whether in operation or in the planning, research or development stage) that is a Competitive Business, or for which the Company had, prior to the date of termination, developed a written business plan, developed a written business plan, in the states and/or territories of the United States, unless Distributor shall obtain the prior written consent of the Company, given in its sole discretion, which consent shall make express reference to this Agreement.

**13. NON-SOLICITATION OF EMPLOYEES.** During the Term, and for a period of one (2) years from the end of the Term, Distributor and/or Supplier will not directly or indirectly solicit or induce, or aid any other entity or person in soliciting or inducing, or knowingly permit any entity directly or indirectly controlled by her to solicit or induce, any person who is, or during the last three months of Distributor's engagement by the Company was, an officer, director, Distributor, Contractor, consultant or employee of the Company or any of its affiliates or any of its existing or future subsidiaries to leave the employment or association with the Company, its affiliate or subsidiary, to become employed or retained by any other entity or to participate in the establishment of any other business.

**14. NON-SOLICITATION OF SUPPLIERS AND CUSTOMERS.** During the Term, and for a period of one (2) years from the end of the Term, Distributor and/or Supplier will not directly or indirectly solicit or induce, or aid any other entity or person in soliciting or inducing, or knowingly permit any entity directly or indirectly controlled by her to solicit or induce, any customer and/or supplier of Company to directly or indirectly do any business with Contractor or any company associated with Contractor or directly or indirectly solicit or induce, or aid any other entity or person in soliciting or inducing, or knowingly permit any entity directly or indirectly controlled by her to solicit or induce, any customer and/or supplier of Company to leave any association with the Company, its affiliate or subsidiary.

**15. ENTIRE AGREEMENT.** This Agreement constitutes the entire contract between the parties. All terms and conditions contained in any other writings previously executed by the parties regarding the matters contemplated herein shall be deemed to be merged herein and superseded hereby. No modification of this Agreement shall be deemed effective unless in writing and signed by the parties hereto.

**16. WAIVER OF BREACH.** The waiver by the Company of a breach of any provision of this Agreement by Contractor shall not operate or be construed as a waiver of any subsequent breach by Contractor.

**17. SEVERABILITY.** If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

**18. APPLICABLE LAW.** This Agreement shall be governed by the laws of the State of North Carolina.

**19. SIGNATORIES.** This Agreement shall be signed by Lonnie Roy Wallace, Managing Director on behalf of Emage Medical LLC and by Cari Cox Burke. This Agreement is effective as of the date first above written.

COMPANY:

Emage Medical LLC

By: _Jonnie Wallace_ 10/30/19
     Lonnie Roy Wallace
     Managing Director

CONTRACTOR:

Cari Cox Burke

By: _Cari Cox Burke_

## *INDEPENDENT CONTRACTOR AGREEMENT*

This Independent Contractor Agreement (this "Agreement") is made effective as of January 13, 2025, by and between Emage Medical LLC (the "Company"), with its principal place of business at 7515 Robin Crest Road, Charlotte, North Carolina, and Cari Ray aka Cari Burke (the "Contractor"), of 1932 Kelley Lake Drive, York, South Carolina. In this Agreement, the party who is contracting to receive the services shall be referred to as "Company", and the party who will be providing the services shall be referred to as "Contractor."

This agreement supersedes any prior Agreement between the Company and Contractor.

**1. DESCRIPTION OF SERVICES.** Beginning on January 13, 2025 the Contractor will provide the following services (collectively, the "Services"):

- See Addendum A

The Company has the right of control over what services the Contractor will perform. The Company does not have this right of control over how the Contractor will perform the services.

**2. PAYMENT FOR SERVICES.** The Company will pay compensation to the Contractor for the Services. Payments will be made as follows:

Commissions as follows:

- 5% on supply sales
- 3% on equipment sales from Account Managers who have been with Emage more than 2 years
- 5% on equipment sales from Account Managers who have been with Emage from 1 to 2 years
- 10% on equipment sales from Account Managers who have been with Emage less than one year
- 8% on equipment sales resulting from Account Managers' cold calls
- 7% on equipment sales from current distributors
- 10% on equipment sales from new distributors
- $72,000 annual (paid monthly) stipend for labor to perform the above
- Bonuses when Company-wide sales goals are met
- Additional commissions Company will authorize from time to time

No other fees and/or expenses will be paid to the Contractor, unless such fees and/or expenses have been approved in advance by the appropriate executive on behalf of the Company in writing. The Contractor shall be solely responsible for any and all taxes, Social Security contributions or payments, liability and disability insurance, unemployment taxes, and other payroll type taxes applicable to such compensation.

**3. TERM/TERMINATION.** This Agreement may be terminated by either party upon written notice to the other party. Furthermore, the Contractor has the ability to terminate this Agreement "at will."

EXHIBIT

B

**4. RELATIONSHIP OF PARTIES.** It is understood by the parties that the Contractor is an independent contractor with respect to the Company, and not an employee of the Company. The Company will not provide fringe benefits, including health insurance benefits, paid vacation, or any other employee benefit, for the benefit of the Contractor.

It is contemplated that the relationship between the Contractor and the Company shall be a non-exclusive one. The Contractor also performs services for other organizations and/or individuals. The Company has no right to further inquire into the Contractor's other activities.

During the Term of this Agreement, Company is authorized to use and reuse without additional compensation, Contractor's name, photograph, likeness, voice, and biographical information, and any reproduction or simulation thereof in any media now known or hereafter developed, for valid business purposes of the Company.

**5. COMPANY'S CONTROL.** The Company has no right or power to control or otherwise interfere with the Contractor's mode of effecting performance under this Agreement. The Company's only concern is the result of the Contractor's work, and not the means of accomplishing it. Except in extraordinary circumstances and when necessary, the Contractor shall perform the Services without direct supervision by the Company.

Contractor is responsible for complete recordkeeping in Company's CRM, and providing periodic sales reporting to Company when requested. Company will provide Contractor with brochures, forms, and marketing materials.

Any Company equipment, such as computers or equipment for demonstrations, are the property of Company and must be returned to Company immediately upon termination. Company is responsible for shipping charges to and from Contractor.

**6. PROFESSIONAL CAPACITY.** The Contractor is a professional who uses his or her own professional and business methods to perform services. The Contractor will receive specific training on products from the Company, but will only receive training regarding how to perform the Services upon Contractor's request.

**7. EXPENSES PAID BY CONTRACTOR.** The Contractor's business and travel expenses (hotel, airfare, parking, rental car and meal stipends for events Company has paid to attend) may be paid by the Company or reimbursed by the Company only with prior approval. Contractor has the option of taking a ride sharing (such as Uber) to an airport and back to their home office and be reimbursed to avoid airport parking charges for such travel.

**8. OWNERSHIP OF SOCIAL MEDIA CONTACTS.** Any social media contacts, including "followers" or "friends," that are acquired through accounts (including, but not limited to email addresses, blogs, Twitter, Facebook, YouTube, LinkedIn, or other social media networks) used or created on behalf of the Company are the property of the Company. Contractor will provide Company with all current Company user names and passwords and notify Company immediately when changes are made to user names and passwords.

**9. CONFIDENTIALITY.** Contractor may have had access to proprietary, private and/or otherwise confidential information ("Confidential Information") of the Company. Confidential Information shall mean all non-public information which constitutes, relates or refers to the operation of the business of the Company, including without limitation, all financial, investment, operational, personnel, sales, marketing, managerial and statistical information of the Company, and any and all trade secrets, customer lists, or pricing information of the Company. The nature of the information and the manner of disclosure are such that a reasonable person would understand it to be confidential. The Contractor will not at any time or in any manner, either directly or indirectly, use for the personal benefit of the Contractor, or divulge, disclose, or communicate in any manner any Confidential Information. The Contractor will protect such information and treat the Confidential Information as strictly confidential. This provision shall continue to be effective after the termination of this Agreement. Upon termination of this Agreement, the Contractor will return to the Company all Confidential Information, whether physical or electronic, and other items that were used, created, or controlled by the Contractor during the term of this Agreement.

This Agreement is in compliance with the Defend Trade Secrets Act and provides civil or criminal immunity to any individual for the disclosure of trade secrets: (i) made in confidence to a federal, state, or local government official, or to an attorney when the disclosure is to report suspected violations of the law; or (ii) in a complaint or other document filed in a lawsuit if made under seal.

**10. NO RIGHT TO ACT AS AGENT.** An "employer-employee" or "principal-agent" relationship is not created merely because (1) the Company has or retains the right to supervise or inspect the work as it progresses in order to ensure compliance with the terms of the contract or (2) the Company has or retains the right to stop work done improperly. The Contractor has no right to act as an agent for the Company and has an obligation to notify any involved parties that it is not an agent of the Company.

Contractor does not have the authority to enter into any contracts on behalf of Company or bind Company to any obligation. In addition, all orders and sales booked by Contractor are subject to the acceptance and approval of Company in its sole discretion.

**11. RIGHT OF REPRESENTATION.** Nothing in this Agreement shall be construed to preclude the Company from selling, leasing or otherwise marketing any of the Company's Services and/or Products directly to any customer. Notwithstanding the foregoing, the Company reserves the right to place the Products with educational, research or similar institutions and practitioners for research and/or educational purposes, for which no commission shall be paid.

**12. RESTRICTIVE COVENANTS.** Contractor covenants and agrees that, during the Term, and for a period of one (1) year from the end of the Term, Contractor shall not engage or participate, directly or indirectly, as a principal, independent contractor, agent, employee, employer, consultant, advisor, sole proprietor, stockholder, partner, trustee, joint venture or in any other individual or representative capacity, in the conduct or management of, or own any stock or other proprietary interest in, or debt of, any business organization, person, firm, partnership, association, corporation, enterprise or other entity that shall be engaged in any

business (whether in operation or in the planning, research or development stage) that is a Competitive Business, or for which the Company had, prior to the date of termination, developed a written business plan in the states and/or territories of the United States, unless Contractor shall obtain the prior written consent of the Company, given in its sole discretion, which consent shall make express reference to this Agreement. Competitive Business is defined as any business which competes, directly or indirectly, with sales of aesthetic equipment and supplies.

**13. NON-SOLICITATION OF EMPLOYEES.** During the Term, and for a period of two (2) years from the end of the Term, Contractor will not directly or indirectly solicit or induce, or aid any other entity or person in soliciting or inducing, or knowingly permit any entity directly or indirectly controlled by her to solicit or induce, any person who is, or during the last three months of Contractor's engagement by the Company was, an officer, director, Distributor, Contractor, consultant or employee of the Company or any of its affiliates or any of its existing or future subsidiaries to leave the employment or association with the Company, its affiliate or subsidiary, to become employed or retained by any other entity or to participate in the establishment of any other business.

**14. NON-SOLICITATION OF SUPPLIERS AND CUSTOMERS.** During the Term, and for a period of two (2) years from the end of the Term, Contractor will not directly or indirectly solicit or induce, or aid any other entity or person in soliciting or inducing, or knowingly permit any entity directly or indirectly controlled by her to solicit or induce, any customer and/or supplier of Company to directly or indirectly do any business with Contractor or any company associated with Contractor or directly or indirectly solicit or induce, or aid any other entity or person in soliciting or inducing, or knowingly permit any entity directly or indirectly controlled by her to solicit or induce, any customer and/or supplier of Company to leave any association with the Company, its affiliate or subsidiary.

**15. ENTIRE AGREEMENT.** This Agreement constitutes the entire contract between the parties. All terms and conditions contained in any other writings previously executed by the parties regarding the matters contemplated herein shall be deemed to be merged herein and superseded hereby. No modification of this Agreement shall be deemed effective unless in writing and signed by the parties hereto.

**16. WAIVER OF BREACH.** The waiver by the Company of a breach of any provision of this Agreement by Contractor shall not operate or be construed as a waiver of any subsequent breach by Contractor.

**17. SEVERABILITY.** If any provision of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

**18. APPLICABLE LAW.** This Agreement shall be governed by the laws of the State of North Carolina.

Cari Burke (Ray)
National Sales Manager
Addendum A

Purpose:
To increase sales 25% in 2025 (over 2024) by developing a nation-wide sales team and distributors, training the team, supervising the team, and regular reporting to Emage owners.

Goals:
1. Recruit at least one new Account Manager per quarter (4/year) in large metropolitan areas including New York City, Houston, and Chicago, and other areas we do not have current coverage
2. Increase sales of Hybrids, SunLites, and Halos to a minimum of $700,000 in COG of PIE purchases in 2025
3. Increase sales of CytoPen S2s to minimum sales requirement for the goal of exclusivity
4. Recruit at least one new distributor every quarter (4/year).
5. Develop one new revenue source this year (e.g. Empire Medical Training)
6. Sales to increase at least 25% in 2025 over 2024

Duties:
- Onboard Account Managers:
  - Create contracts (to be approved by owner)
  - Get Account Managers' information to CFO to set up email, CRM, Google drive permissions, and payroll
  - Order business cards and nametags
  - Arrange training of new Account Managers according to onboarding spreadsheets live or virtual (videos only to be used as supplements)
  - Set sales goals for each Account Manager
  - Determine when each Account Manager is proficient on selling all products
  - Determine when each Account Manager is proficient on events
  - Set up time for owner to confirm training
- Supervising Account Managers:
  - Set regular goals for each Account Manager and distributor
  - Track leads and close ratios
  - Distribute leads and events fairly
  - Be available to Account Managers and distributors for individual sales issues
  - Arrange continuing live and virtual training with Account Managers and distributors as needed
  - Meet with each Account Manager weekly
    - Review tasks
    - Issues they are having with individual sales
    - Sales goals met/sales goals not met
    - Setting new sales goals – week/month/year
- Meet with management team weekly to discuss:
  - Report on status of new Account Managers and distributors
  - Report on major sales pending
  - Report on close ratio for each Account Manager
  - Report on issues with Account Managers and distributors
  - Report on recruitment of Account Managers and distributors
  - Report on training of Account Managers and distributors
- Meet with management team monthly to discuss:

- Report on close ratio and gross profit for each Account Manager
- Report on close ratio and gross profit overall on each piece of equipment
- Report on close ratio and gross profit on each "territory" – internet leads, Empire, etc.
- Report on sales and gross profit on distributor sales
- Report on status of new revenue sources
- Future events to attend and Account Managers to assign
- Other Duties:
  - Make recommendations for marketing programs
  - Create and implement weekly email blasts after approval from owner
  - Assist in website development/maintenance/blogging
  - Lead weekly meetings with Account Manager group
  - Supervise Social Media contractor, always approving before any post
  - Preliminarily approve expense reports
  - Preliminarily approve contract labor
  - Email preliminary payroll and expense reports to CFO by the second and seventeenth of each month
  - Review payroll and confirm with CFO within 24 hours of receipt of payroll from CFO

February 21, 2025

**SUMMIT LAW**

**Brandy B. Milazzo**
**ATTORNEY**
**BrandyMilazzo@SummitLawNC.com**

**VIA Email:** <u>CJinRockHill@me.com</u>

338 S. Sharon Amity Rd., #332
Charlotte, NC 28209

Cari Burke Ray
1932 Kelley Lake Drive
York, SC 29745

D (980) 470-2001
O (980) 470-2020
F (980) 470-2019

Re:  Termination of your relationship with Emage Medical

**www.SummitLawNC.com**

Dear Mrs. Ray:

      I am writing this letter to let you know on behalf of our client, Emage Medical ("Emage"), that Emage will no longer require your any of your services, immediately upon receipt of this letter, today February 21, 2025, and desires to immediately terminate your independent contractor agreement that was effective as of January 13, 2025  with Emage ("Your Contract").  Our client's team has really enjoyed working with you over the past several years, but Emage has decided to go in a different direction. I, on behalf of them, thank you for all the great work you brought to them during your time together.

      Beginning today, February 21, 2025, immediately, you will no longer have access to Emage's company network, email, phone, or your Emage credit card.  Please return your phone and all other Emage property, such as your laptop, other equipment, CytoPen, and CytoPeel, at your earliest convenience.  Please immediately provide us with all usernames and passwords to the Company's social media and other accounts that you may have.  You are hereby prohibited from utilizing any property of the Company.

      In exchange for your acknowledgment and signature of, and agreement to, the Mutual Release attached hereto as <u>Exhibit A</u>, Emage will pay you (1) your prorated normal monthly stiped through February 28, 2025; (2) your commissions through February 28, 2025; and (3) a 7% of Q4 profits, all on March 7, 2025, as is consistent with past and current Emage compensation practices with you.

**EXHIBIT**

*C*

# EXHIBIT A

**MUTUAL RELEASE**

For valuable consideration as defined hereinbelow, Emage Medical, LLC, a North Carolina limited liability company ("Emage"), and Cari Ray Burke, a South Carolina resident ("Cari"), by their respective signatures below, enter into this mutual release (this "Mutual Release"), made effective as of the date of the last of the parties' signatures below (the "Effective Date"). In exchange for, and in consideration of, the payments, benefits and other commitments set forth in the letter from Summit Law on behalf of Emage dated February 21, 2025 (the "Letter"), the parties, for themselves, their officers, affiliates and for each of their heirs, executors, administrators, and assigns, hereby fully releases, acquits, and forever discharges the other party and each of their predecessors, successors and assigns, parent corporations, subsidiary corporations, affiliated corporations, joint ventures, and the chairpersons, officers, directors, owners, members, employees, attorneys and agents, past and present, of each of the aforesaid entities ("Related Persons") of and from any and all claims, liabilities, causes of action, damages, costs, attorneys' fees, expenses, and compensation whatsoever, of whatever kind or nature, in law, equity or otherwise, whether known or unknown, vested or contingent, suspected or unsuspected, that either party may now have or has ever had against the other party (the "Released Claims"). Each of the Related Persons are intended third party beneficiaries of this Mutual Release and the release herein. The parties each hereby release the other from any and all past and present claims, contractual or otherwise, except for the obligations hereunder. Cari's release hereunder includes without limitation any and all claims against Emage that arise out of her relationship or termination therewith, and Cari hereby specifically waives and releases all claims, including, but not limited to, those arising under Title VII of the Civil Rights Act of 1964, as amended, the Civil Rights Act of 1991; the Equal Pay Act; the Americans With Disabilities Act of 1990; the Rehabilitation Act of 1973, as amended; the Family and Medical Leave Act; Sections 1981 through 1988 of Title 42 of the United States Code, as amended; the Immigration Reform and Control Act, as amended; the Worker Adjustment and Retraining Notification Act, as amended; the Occupational Safety and Health Act, as amended; the Sarbanes-Oxley Act of 2002; the Consolidated Omnibus Budget Reconciliation Act (COBRA); the Employee Retirement Income Security Act of 1974, as amended (ERISA); the National Labor Relations Act (NLRA); the North Carolina Equal Employment Practices Act (EEPA), Persons with Disabilities Protection Act (PDPA), and Retaliatory Employment Discrimination Act (REDA); the North Carolina Wage and Hour Act (NCWHA), all as amended, and any and all claims under state or local statutes, ordinances, or regulations, as well as all claims arising under federal, state, or local law involving any tort, employment contract (express or implied), public policy, wrongful discharge, or any other claim that arise out of her relationship with Emage or separation therefrom. Cari covenants not to sue on any of the Released Claims.

Nothing in this Mutual Release is intended to waive claims (i) for unemployment or workers' compensation benefits, (ii) for vested rights under ERISA-covered employee benefit plans as applicable on the date Cari signs this Mutual Release, or (iii) which cannot be released by private

agreement. Upon payment of amounts referenced in the Letter, Cari represents and affirms that she has received all leave (paid or unpaid) and has been paid all compensation, wages, bonuses, commissions, and/or benefits to which she may be entitled and that no other leave (paid or unpaid), compensation, wages, bonuses, commissions, and/or benefits are due to her by the Company or Released Persons, except as provided for in this Mutual Release. Cari also affirms that she has reported all work-related injuries suffered during her relationship with Emage and any and all concerns regarding suspected ethical and compliance issues or violations on the part of Emage or any Released Person or entity.

Each party agrees that the covenants, releases and representations hereunder are a material inducement to the other party's promises herein and agreement to enter into this Mutual Release.

EMAGE MEDICAL LLC

BY:_____ (SEAL)          _____
(SEAL)

   Lonnie Roy Wallace, Owner          Cari Ray Burke

Dated: _____          Dated: _____

 Gmail

Lauren Wallace <lauren@emagemedical.com>

## Fwd: Cari and Hannah here - Remember us?
6 messages

**Sally Bevans** <sally@emagemedical.com>                    Mon, May 19, 2025 at 11:34 AM
To: Lonnie Wallace <lonnie@emagemedical.com>, Lauren Wallace <Lauren@emagemedical.com>

Warmest Regards,
Sally Bevans
Vice President of Sales - Emage Medical
702-419-0972
Sally@EmageMedical.com

Begin forwarded message:

> **From:** Michelle Langston <starliteaestheticsandwellness@gmail.com>
> **Date:** May 19, 2025 at 10:54:51 AM EDT
> **To:** Sally Bevans <sally@emagemedical.com>
> **Subject: Fwd: Cari and Hannah here - Remember us?**

---------- Forwarded message ---------
From: **Cari Ray** <hannah@insightinnovationpartners.com>
Date: Tue, May 13, 2025 at 12:45 PM
Subject: Cari and Hannah here - Remember us?
To: <Starliteaestheticsandwellness@gmail.com>

## INISIGHT INNOVATION PARTNERS





# Cari and Hannah here - Remember us?

We have applied our years of knowledge and experience from the aesthetics industry together and we are THRILLED to introduce you to *Insight Innovation Partners* -

The aesthetics industry's leading imaging company focused on advanced analysis equipment to do the 'selling' for you, in your practice!

At Insight, we are **proud** to have brought 3D imaging, AI analysis, aging simulators, marketing analyzation, and beautifully designed technology integrated into *one device* (unlike ANY other in the industry), for practices that want to improve both revenue and the patient experience.

We want to *CELEBRATE* our grand opening with you, and over the next 3 days, we're going to share how our breakthrough technology can help you solve **low patient conversion**, eliminate **guesswork in treatment planning**, and say goodbye to **unreliable visual proof of results**, all resulting in increased revenue for your practice!

We have LOTS of exciting things to announce and offer over the next few days to celebrate our new venture, so STAY TUNED and look out for my email tomorrow called **Turn "Let Me Think About It" into "Let's do it!".**

> Subscribe to our VIP list to be the first in the 'know'

8/14/25, 11:14 AM

Emage Medical Mail - Fwd: Cari and Hannah here - Remember us?





Hannah@insightinnovationpartners.com
Insightinnovationpartners.com
(803)412-4863

This email was sent to Starliteaestheticsandwellness@gmail.com
why did I get this?    unsubscribe from this list    update subscription preferences
Insight Innovation Partners · 81 Pointe Cir # 8 · Greenville, SC 29615-3505 · USA

**Lonnie Wallace** <lonnie@emagemedical.com>
To: Brandy Milazzo <BrandyMilazzo@summitlawnc.com>
Cc: Lauren Wallace <lauren@emagemedical.com>

Tue, May 20, 2025 at 12:32 PM

Cari and Hannah are hitting our customer database hard.

Cari and Hannah do not have their own databases. When I hired Cari, she was an HR manager, and Hannah was a secretary.

I assume this will all be made clear in discovery.

 Gmail

**Lauren Wallace <lauren@emagemedical.com>**

## Unapproved email address
1 message

**Less Annoying CRM** <help@lessannoyingcrm.com>                    Wed, May 14, 2025 at 10:05 PM
To: Lauren <Lauren@emagemedical.com>

Hi Lauren,

We just received a logged email to your CRM that we were not able to process because the email was sent from an email address we don't recognize as yours. The email address was:

cari@insightinnovationpartners.com

Rest assured, no one has tried to log into your account, we simply received an email to your logging address that was sent from an email address we don't recognize as yours. These are the two most common reasons this happens:

- You use multiple emails, and haven't yet added your other emails to your approved list.
- You accidentally CCed your logging address, instead of BCCing it, when emailing a client and they replied all back to you.

You can learn more about unapproved email addresses, and reasons you might have gotten this email here.

If you did use the above address to send this email and might use that same address in the future, we just need to add this address to your approved list. Once we've done that, emails logged to the CRM from this email address will be accepted. We'll also process the email we just received so that it shows up in your CRM as you expected!

Click here to add cari@insightinnovationpartners.com to your approved senders list

If you don't want to use that email address to log emails in the future, you can simply ignore this notice, and we won't bother you about this specific email address again.

If you have any questions or concerns of any kind, simply reply to this email and our CRM Coaches will be happy to help you out!

Thanks,

The Less Annoying Team



EXHIBIT

E