IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 3:26-cv-00157

| | |
|---|---|
| **Emage Medical, LLC**<br><br>Plaintiffs,<br><br>v.<br><br>**Insight Innovation Partners, LLC and Cari Ray**<br><br>Defendants. | **Defendants' Memorandum of Law in Support of their Partial Motion to Dismiss Pursuant to Rule 12(b)(6)** |

NOW COME Defendants Insight Innovation Partners, LLC and Cari Ray, by and through the undersigned counsel and submit the following Memorandum of Law in support of their Partial Motion to Dismiss, which seeks to dismiss Plaintiff's claim for Breach of Contract as it relates to the "Restrictive Covenants" section of the Second Ray ICA and its claim for Unfair and Deceptive Trade Practices.

## Background

### Allegations of Fact

The allegations in the Complaint, taken as true for purposes of this Motion, are as follows. Plaintiff Emage is in the business of distributing aesthetic medical supplies. (Compl. ¶ 5.) Emage was incorporated by Lonnie Roy Wallace ("Mr. Wallace"). (Compl. ¶ 4.) Emage first hired Defendant Cari Ray to act as a salesperson in November of 2019, pursuant to an independent contractor agreement. (Compl. ¶ 6.) Mr. Wallace and Ms. Ray allegedly reached a verbal agreement in late summer of 2022 by which Ms. Ray would run Emage's day-to-day operations as CEO and thus receive a consulting fee and be eligible for an increased commission schedule

and 7% of net profits while Mr. Wallace would semi-retire. (Compl. ¶ 22.) In September of 2022, Ms. Ray began serving as CEO of Emage (Compl. ¶ 23), but due to allegedly declining gross sales and net profits, in January of 2024, Ms. Ray returned to her original sales role pursuant to an alleged verbal agreement between Mr. Wallace and Ms. Ray. (Compl. ¶¶ 27-28.) Emage also alleges "[u]pon information and belief" that "While acting as CEO," Ms. Ray "funnel[ed] the majority of Emage's profits to herself." (Compl. ¶116.)

### Allegations Regarding FDA Corrective Actions

Because Emage sells medical devices, it is subject to the authority of the U.S. Food and Drug Administration (the "FDA"). During Ms. Ray's tenure as acting CEO, the FDA conducted a short-notice inspection of Emage that resulted in the issuance of several notices of noncompliance (collectively, the "FDA Violations"). (Compl. ¶ 37.) After Emage received the FDA Violations, Ms. Ray promised Mr. Wallace that she would oversee the corrective action (the "Corrective Action") necessary to remedy the violations and bring Emage into compliance with the FDA. (Compl. ¶ 39.) In July of 2023, Mr. Wallace began having weekly meetings with Ms. Ray regarding her progress on the Corrective Actions. (Compl. ¶ 42.) At each meeting, Ms. Ray represented to Mr. Wallace that she was progressing with the Corrective Actions and would complete them by the deadline set by the FDA. (Compl. ¶ 43.) When Ms. Ray failed to provide another Emage employee with the documentation necessary to fully implement the Corrective Actions, Mr. Wallace inspected Ms. Ray's files and did not see any progress toward the completion of the Corrective Actions. (Compl. ¶¶ 44-46.) Although Mr. Wallace asked his wife to take over the task of performing the Corrective Actions and Mrs. Wallace hired a consultant to assist her, the FDA cited multiple issues of non-compliance during a September 2024 re-inspection. (Compl.

¶¶ 47-49.)

**<u>Allegations Regarding the Cytopeel Device</u>**

In mid-2023, while serving as CEO, Ms. Ray represented to Mr. Wallace that she had discovered a medical device manufactured in China called the "Cytopeel" that she believed would be a profitable product for Emage to sell. (Compl. ¶ 51.) Ms. Ray told Mr. Wallace that a Chinese company called ADSS manufactured the Cytopeel (Compl. ¶ 53) and that her contact with ADSS was a Chinese citizen who represented ADSS. (Compl. ¶ 54.) Mr. Wallace was suspicious of the Chinese Representative because he had a gmail account rather than a business email account so he asked Ms. Ray to verify that the Chinese Representative did in fact represent ADSS and that ADSS was in fact the manufacturer of the Cytopeel. (Compl. ¶¶ 55-56.) Ms. Ray represented to Mr. Wallace that she had verified with ADSS that the Chinese Representative was employed by ADSS and that ADSS was the manufacturer of the Cytopeel. (Compl. ¶ 57.) In reliance on Ms. Ray's representations, Mr. Wallace approved Emage's purchase and distribution of the Cytopeel. (Compl. ¶ 58.) In February of 2025, after an investigation, Mr. Wallace learned that ADSS was not the manufacturer of the Cytopeel and that documentation provided by the Chinese Representative to induce Emage to purchase the Cytopeel was not authentic. (Compl. ¶ 64.)

Emage alleges that "[u]pon information and belief, Ms. Ray knew that … ADSS was not the manufacturer of the Cytopeel and that the Chinese Representative was not an authorized representative of ADSS." (Compl. ¶ 65.) In the alternative, Emage alleges that "Ms. Ray acted negligently or recklessly by failing to investigate the Chinese Representative thoroughly." (Compl. ¶ 66.) As a result of Ms. Ray's alleged actions, Emage has suffered damages. (Compl. ¶ 68.)

## Allegations Regarding Breach of Restrictive Covenants

Emage terminated Ms. Ray's contractor relationship on or about February 21, 2025. (Compl. ¶ 70.) Emage alleges that "Upon information and belief, upon her receipt of the Termination Letter, Ms. Ray accessed Emage's confidential database to download several items specifically defined as Confidential Information." (Compl. ¶ 73.) In March of 2025, Ms. Ray formed Insight. (Compl. ¶ 75.) In May of 2025, Ms. Ray sent a solicitation blast email to all of Emage's customers on behalf of Insight. (Compl. ¶ 76.) Emage alleges that "upon information and belief, through and with Insight, Ms. Ray [h]as solicited the business of some or all of Emage's Customers, [h]as solicited the business of some or all of the Emage Suppliers, [h]as engaged Emage's chemist to replicate Emage's products and sell them through Insight, [i]s selling the same products that Emage sells, using the Confidential Information to undercut Emage's prices, [and] [i]s directly competing with Emage. (Compl. ¶ 81.) Emage alleges "[u]pon information and belief" that Ms. Ray "destroy[ed] Emage's reputation and goodwill in order to poach Emage Customers and Emage Suppliers and enrich Insight." (Compl. ¶ 116(e).)

## Legal Standard

**Motion to Dismiss**

A Rule 12(b)(6) motion to dismiss for failure to state a claim tests the legal sufficiency of the complaint. "A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of the claims pled in a complaint." *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 211 (4th Cir. 2019). The Federal Rules of Civil Procedure require that the pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief...." Fed. R. Civ. P. 8(a). This

pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "Labels, conclusions, recitation of a claim's elements, and naked assertions devoid of further factual enhancement will not suffice to meet the Rule 8 pleading standard." *Id.* A plaintiff's allegations of fact "must rise above a speculative level" and its complaint must assert "enough facts to state a claim to relief that is plausible on its face." *Withers v. BMW of N. Am., LLC*, 560 F. Supp. 3d 1010, 1017 (W.D.N.C. 2021) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A claim is plausible on its face where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Withers v. BMW of N. Am., LLC*, 560 F. Supp. 3d 1010, 1017 (W.D.N.C. 2021) (quoting *Iqbal,* 556 U.S. at 678).

To "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to `state a claim to relief that is plausible on its face.'" *Iqbal,* 556 U.S. at 678 (citing *Twombly,* 550 U.S. at 570). To contain sufficient factual matter to make a claim plausible, the factual content must "allow… the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Although the Court must accept the factual allegations in the complaint as true, it need not accept a complaint's legal conclusions. *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 212 (4th Cir. 2019) "Thus, simply reciting the cause of actions' elements and supporting them by conclusory statements does not meet the required standard." *Id.*

**Non-Compete**

A covenant not to compete is not viewed favorably in modern law. *See Sterling Title Co. v. Martin*, 266 N.C. App. 593, 597, 831 S.E.2d 627, 631 (2019). In fact, covenants not to compete

are disfavored. *Med. Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 655, 670 S.E.2d 321, 327 (2009).

In order for a noncompete to be valid, such must be (1) in writing; (2) part of a contract for employment; (3) based on valuable consideration; (4) for a reasonable length of time and territory; and (5) not against public policy. *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 649-50, 370 S.E.2d 375, 380 (1988).

A noncompete "must be no wider in scope than is necessary to protect the business of the employer." *Manpower of Guilford Cty., Inc. v. Hedgecock*, 42 N.C. App. 515, 521, 257 S.E.2d 109, 114 (1979). The North Carolina Court of Appeals has held that covenants that prohibit an employee from employment with a competitor for wholly unrelated work are overly broad and unenforceable. *VisionAIR, Inc. v. James,* 167 N.C. App. 504, 508-09, 606 S.E.2d 359, 362-63 (2004). See also *Medical Staffing Network, Inc.* at 656.

In other words, a noncompete that restricts an employee from engaging in any and all forms of work with a competing employer is necessarily a violation of public policy and thus unenforceable.

**Unfair and Deceptive Trade Practices**

To survive a motion to dismiss on a claim for Unfair and Deceptive Trade Practices ("UDTP"), a plaintiff must allege facts indicating that (1) the defendant committed an unfair or deceptive trade practice; (2) the act or practice in question was in or affecting commerce; and (3) plaintiff suffered damages as a result of the act in question. *Lowe's Co. v. Ferrandino & Son, Inc.*, No. 5:22-CV-00033-KDB-DCK, 2022 U.S. Dist. LEXIS 132447, at *5 (W.D.N.C. July 25, 2022).

"A trade practice is unfair when it offends established public policy or is immoral,

unethical, oppressive, unscrupulous, or substantially injurious to consumers, and deceptive if it has the capacity or tendency to deceive...." *Id*. (quotations omitted).

A "breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action" for Unfair and Deceptive Trade Practices under N.C.G.S. § 75-1.1." *Lowe's*, 2022 U.S. Dist. LEXIS 132447, at *6 (citation omitted). Rather, "a plaintiff must show substantial aggravating circumstances attending the breach." *Id.*

"The determination of whether an act or practice is in or affects commerce is one of law." *Duffy v. Schussler*, 287 N.C. App. 46, 882 S.E.2d 675 (2022) (citation omitted). The statute defines commerce as "all business activities" (N.C. Gen. Stat. § 75-1.1(b)), however the North Carolina Supreme Court "has repeatedly held that the 'internal operations of a single business ... are not business activities within the General Assembly's intended meaning of the term.'" *Duffy* 287 N.C. App. at 72 (quoting *White v. Thompson,* 364 N.C. 47, 52, 691 S.E.2d 676, 679 (2010).) Therefore, "any unfair or deceptive conduct contained solely within a single business is not covered" by the Unfair and Deceptive Trade Practices Act. *Duffy* 287 N.C. App. at 72.

## Argument

I. **Breach of Contract - Second Ray ICA (Violation of Noncompete)**

Because the noncompete in the Second Ray ICA is overly broad as to scope and thus unenforceable, Emage fails to state a claim for its violation.

Section 12 of the Second Ray ICA contains the following provision:

> **12. RESTRICTIVE COVENANTS.** Contractor covenants and agrees that, during the Term, and for a period of one (1) year from the end of the Term, Contractor shall not engage or participate, **directly or indirectly**, as a principal, independent contractor, agent, employee, employer, consultant, advisor, sole proprietor, stockholder, partner, trustee, joint venture or **in any other individual or**

> **representative capacity**, in the conduct or management of, or own any stock or other proprietary interest in, or debt of, any business organization, person, firm, partnership, association, corporation, enterprise or other entity that shall be engaged in any business (whether in operation or in the planning, research or development stage) that is a Competitive Business, or for which the Company had, prior to the date of termination, developed a written business plan in the states and/or territories of the United States…Competitive Business is defined as any business which competes, directly or indirectly, with sales of aesthetic equipment and supplies.

Exhibit 1.2 (emphasis added).

The Restrictive Covenants as set forth in Section 12 of the Second Ray ICA (hereinafter referred to as the "NCAs") violate public policy, as they prohibit Ms. Ray from working "in any…individual or representative capacity" for a competitor, rather than limiting their scope to preventing her from working in a similar or identical position that she held with Emage, which *VisionAIR* requires.

As set forth in the Complaint, Ms. Ray worked first as a salesperson (Compl. ¶ 6), then as the titular CEO. (Compl. ¶ 22.) The NCAs broadly prohibit Ms. Ray from performing any work of any kind for any entity that "competes, directly or indirectly, with sales of aesthetic equipment and supplies," regardless of whether that work relates in any way to sales or the duties of a CEO. For example, this provision would prohibit Ms. Ray from working as a receptionist, janitor, or delivery driver for any business that competes, directly or indirectly, with sales of aesthetic equipment and supplies. Emage has no legitimate business interest in preventing Ms. Ray from working as a delivery driver. Further, the terms "aesthetic equipment and supplies" are not defined in the NCAs, which underscores the overbreadth of its restrictions and renders it unenforceable.

Because the NCAs are overly broad and violates public policy, Section 12 of the Second Ray ICA is unenforceable as a matter of law. Therefore, Emage has failed to state a claim upon which relief can be granted with respect to its claim for breach of the NCAs.

## II.     Unfair and Deceptive Trade Practices

Emage's claim for Unfair and Deceptive Trade Practices fails as a matter of law because the Complaint describes, at most, an internal business dispute and an alleged contractual disagreement between Emage and a former contractor. The conduct alleged in the Complaint falls into two categories: (1) internal communications and decisions within Emage regarding Ms. Ray's performance and compensation, and (2) an alleged effort by Ms. Ray, through Insight, to compete with Emage after the termination of her relationship with the company.

Neither category supports a claim under North Carolina's Unfair and Deceptive Trade Practices Act. The first category involves purely internal business operations and therefore does not occur in or affecting commerce. The second category consists of conclusory allegations that lack factual support and, even if true, describe at most a contractual dispute regarding restrictive covenants rather than the type of egregious conduct required to state a UDTPA claim.

For these reasons, Emage fails to state a claim for Unfair and Deceptive Trade Practices.

### A.     Allegations (a)–(d) are Not "In or Affecting Commerce"

The Complaint alleges that Ms. Ray committed Unfair and Deceptive Trade Practices by:

a. Persuading Mr. Wallace to semi-retire by promising to act as Emage's CEO.
b. While acting as CEO, funneling the majority of Emage's profits to herself.
c. Deceiving Mr. Wallace about her performance of the Corrective Actions to harm Emage's reputation with the FDA.
d. Deceiving Mr. Wallace regarding the authenticity of the Cytopeel in order to make commissions.

(Compl. ¶ 116.)

Each of these allegations concerns internal communications and decisions within Emage itself, specifically alleged representations made by Ms. Ray to Emage's owner, Mr. Wallace,

regarding her performance and compensation. None involve interactions with customers, suppliers, competitors, or any other marketplace participants.

North Carolina courts have repeatedly held that such internal business disputes do not occur "in or affecting commerce" within the meaning of the UDTPA. N.C. Gen. Stat. § 75-1.1(b). Although the statute broadly defines commerce as "all business activities," the North Carolina Supreme Court has made clear that the internal operations of a single business are not business activities within the General Assembly's intended meaning of the term." *White v. Thompson*, 364 N.C. 47, 52, 691 S.E.2d 676, 679 (2010). Accordingly, "any unfair or deceptive conduct contained solely within a single business is not covered" by the [Unfair and Deceptive Trade Practices] Act. *Duffy*, 287 N.C. App. at 72.

The conduct alleged in subparagraphs (a) through (d) falls squarely within this rule. Each allegation concerns statements Ms. Ray allegedly made to Mr. Wallace regarding her performance of duties within the company and the internal management of Emage. Such allegations describe internal corporate matters, not marketplace conduct "in or affecting commerce."

Because these allegations concern only the internal operations of a single business, they do not constitute conduct "in or affecting commerce" under N.C. Gen. Stat. § 75-1.1.

B. **No Facts Support Emage's Allegation that Ray Destroyed Emage's Goodwill**

In Paragraph 116 of its Complaint, Emage also alleges that Ms. Ray "destroy[ed] Emage's reputation and goodwill in order to poach the Emage Customers and Emage Suppliers and enrich Insight." (Compl. ¶ 116(e).)

The Complaint, however, pleads no facts supporting this theory. It does not identify any statement Ms. Ray allegedly made to customers or suppliers, any disparaging communication

about Emage, any customer or supplier who stopped doing business with Emage because of Ms. Ray, or any other conduct capable of destroying Emage's goodwill in the marketplace.

Although the Complaint elsewhere alleges reputational harm arising from the Cytopeel issue and alleged misrepresentations to Mr. Wallace, those allegations concern internal communications within Emage or regulatory issues involving the FDA. They do not describe conduct directed toward customers or suppliers.

Instead, Emage offers only a conclusory characterization of Ms. Ray's conduct. Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to state a claim for relief]." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). For this reason alone, allegation (e) fails to state a plausible claim under the UDTPA.

C.  **Emage Fails to Allege Substantial Aggravating Circumstances**

Even assuming the alleged conduct occurred in commerce, Plaintiff's UDTPA claim still fails because the Complaint does not plead the type of substantial aggravating circumstances required to transform a contractual dispute into an unfair or deceptive trade practice.

North Carolina courts have held repeatedly that a breach of contract, even if it is intentional, "is not sufficiently unfair or deceptive to sustain an action under the UDTPA." *Lowe's* 2022 U.S. Dist. LEXIS 132447, at *6 (citations omitted)(internal quotation marks omitted). Rather, "a plaintiff must show substantial aggravating circumstances attending the breach." *Id.*

In the present case, the alleged misconduct arises almost entirely from Ms. Ray's business relationship with Emage and her alleged performance of duties within that relationship. Allegations (a) through (d) concern internal disputes regarding Ms. Ray's management of Emage,

her compensation, and her handling of regulatory compliance and product sourcing. Allegation (e) concerns Plaintiff's theory that Ms. Ray later competed with Emage through Insight and solicited Emage's customers.

Even accepting these allegations as true, they describe at most a dispute over contractual obligations and post-termination competition. Such allegations do not constitute the type of egregious or deceptive marketplace conduct required to establish "substantial aggravating circumstances" under N.C. Gen. Stat. § 75-1.1. See *Bartolomeo v. S.B. Thomas, Inc.*, 889 F.2d 530, 535–36 (4th Cir. 1989).

It could be argued that Emage's claim in Paragraph 116(b), that Ms. Ray funneled "the majority of Emage's profits to herself," could constitute substantial aggravating circumstances to elevate a simple breach of contract to a claim for Unfair and Deceptive Trade Practices. However, the Complaint is devoid of any facts supporting this conclusory allegation, so it necessarily fails as a matter of law.

Because Emage has alleged no substantial aggravating circumstances beyond an ordinary business dispute, its UDTPA claim should be dismissed.

## Conclusion

For the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiff's claim for Unfair and Deceptive Trade Practices pursuant to Rule 12(b)(6) because the Complaint fails to state a claim upon which relief can be granted.

This, the 13th day of March, 2026

**HULL & CHANDLER**

By: */s/ Elizabeth Vennum*
Elizabeth Vennum
N.C. State Bar No. 49747
Counsel for Defendant
Hull & Chandler
1009 East Boulevard
Charlotte, NC 28203
Tel. (704) 375-8488
Fax (704) 375-8487
lvennum@lawyercarolina.com
*Counsel for Defendants*

## Certificate of Service

This is to certify that on this date the undersigned filed the foregoing using the Court's CM/ECF system which will send notification of such filing to CM/ECF participants, and that the undersigned will serve counsel not registered with CM/ECF by e-mail as follows:

> Jordan LaTorre
> David Redding
> 2901 Providence Road, Suite 303
> Charlotte, North Carolina 28211
> (704) 900-2215
> jlatorre@tlg-law.com
> dredding@tlg-law.com
> *Counsel for Plaintiff*

This, the 13th day of March, 2026

**HULL & CHANDLER**

> By: */s/ Elizabeth Vennum*
> Elizabeth Vennum
> N.C. State Bar No. 49747
> Counsel for Defendant
> Hull & Chandler
> 1009 East Boulevard
> Charlotte, NC 28203
> Tel. (704) 375-8488
> Fax (704) 375-8487
> lvennum@lawyercarolina.com