**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION**

| | |
|---|---|
| **Emage Medical, LLC,**<br><br>                                    **Plaintiff,**<br><br>**v.**<br><br>**Insight Innovation Partners, LLC and**<br><br>**Cari Ray,**<br><br>                                    **Defendants.** | **Defendants' Motion to Dismiss, Answer,<br>Affirmative Defenses, and Cari Ray's<br>Counterclaims** |

## Motion to Dismiss

Pursuant to Fed. R. Civ. P. 12(b)(6), Defendants move to dismiss Plaintiff's Complaint for failure to state a claim.  Defendant's Partial Motion to Dismiss is set forth separately and accompanied by a brief as required by LCvR 7.1(c)(1).

## Answer to Complaint

1.      Emage is a North Carolina corporation with its principal place of business located in Mecklenburg County, North Carolina.

**Admitted on information and belief.**

2.      Upon information and belief, Insight is a South Carolina corporation that does business in North Carolina.

**Admitted.**

3.      Upon information and belief, Ms. Ray is a citizen and resident of South Carolina.

**Admitted.**

4.      Emage's founder, Lonnie Roy Wallace ("Mr. Wallace"), incorporated Emage in 2008.

**Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in this Paragraph 4 and thus deny the same.**

5.      Since its incorporation, Emage has been in the business of distributing aesthetic medical supplies.

**Admitted on information and belief.**

6.      Emage first employed Ms. Ray to act as a salesperson on November 1, 2019, pursuant to an independent contractor agreement (the "First Ray ICA").

**Defendants admit that Ms. Ray and Emage entered into an Independent Contractor Agreement on or about November 1, 2019.  Defendants deny the validity and enforceability of such Independent Contractor Agreement.  Defendants deny that Ms. Ray was ever officially an employee of Emage.**

7.     A true copy of the First Ray ICA is attached hereto as Exhibit "A" and incorporated herein by reference.

**Defendants admit that Exhibit A is a copy of an Independent Contractor Agreement between Ms. Ray (then Burke) and Emage but denies its validity and enforceability and any incorrect conclusions Plaintiff attempts to draw from it.**

8.     The First Ray ICA contained a set of restrictive covenants that precluded her from competing with Emage, soliciting Emage employees and soliciting Emage's customers (the "Emage Customers") and Emage's suppliers (the "Emage Suppliers").

**Defendants admit that the First Ray ICA speaks for itself but deny its validity and enforceability and any incorrect conclusions the Plaintiff attempts to draw from it.**

9.     The First Ray ICA also contained a confidentiality provision that restricted Ms. Ray's use or disclosure of Emage's confidential information (the "Emage Confidential Information.

**Defendants admit that the First Ray ICA speaks for itself but deny its validity and enforceability and any incorrect conclusions the Plaintiff attempts to draw from it.**

10.     Although Ms. Ray lived in South Carolina, she often worked from Emage's Charlotte offices.

**Denied.**

11. The Emage Customers were and are located throughout the country.

**Admitted.**

12. Ms. Ray visited the Emage Customers both virtually and in person.

**Admitted.**

13. Some of the Emage Customers that Ms. Ray personally visited were located in North Carolina.

**Admitted.**

14. In 2021, Mr. Wallace engaged a business broker, Viking Acquisitions, LLC ("Viking") to conduct an estimate of what Emage would be worth if he were to sell it.

**Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in this Paragraph 14, and thus deny the same.**

15. Viking advised Mr. Wallace that Emage could be sold for $2.3MM (the "Viking Estimate").

**Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in this Paragraph 15 and thus denies the same.**

16. Ms. Ray, aware that Mr. Wallace was considering selling Emage, offered to purchase the company for $800,000.00. Given that Ms. Ray's offer was well below the Viking Estimate, Mr. Wallace rejected it.

**Ms. Ray admits she knew Mr. Wallace was considering selling Emage. Except as expressly admitted herein, Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the remaining allegations contained in this Paragraph, and thus deny the same.**

17. In response, Ms. Ray proposed to purchase equity in Emage and begin acting as chief executive officer ("CEO").

**Denied.**

18. In mid-2022, Emage and Ms. Ray reached a verbal agreement (the "First Verbal Agreement") under which:

**Defendants deny that Emage and Ms. Ray had any enforceable verbal agreements.**

a. Ms. Ray would pay Emage $100,000.00 for a percentage of its equity.

**Denied.**

b. Ms. Ray would begin acting as CEO in September of 2022.

**Denied.**

c. Emage would provide Ms. Ray 7% of its equity in addition to what she was to purchase for $100,000.00.

**Denied.**

d.      Ms. Ray would have a first right of refusal if Mr. Wallace decided to sell the remaining equity in Emage.

**Denied.**

**Except as expressly admitted herein, Defendants deny the allegations in this Paragraph 18 and in all its subparts.**

19.     Emage retained attorney Brandy Milazzo ("Ms. Milazzo") in the Summer of 2022 to reduce the First Verbal Agreement to writing (the "Equity Purchase Agreement") and negotiate its terms with Ms. Ray.

**Defendants lack sufficient knowledge and information to form a belief as to the truth or falsity of these allegations and thus denies the same.**

20.     After Emage approved of Ms. Milazzo's draft of the Equity Purchase Agreement, Ms. Milazzo presented it to Ms. Ray for her review and approval.

**Defendants lack sufficient knowledge and information to form a belief as to the truth or falsity of allegations regarding interactions between Emage and its attorney.  Defendants deny that Ms. Milazzo presented Ms. Ray with a draft Equity Purchase Agreement.  Except as expressly admitted herein, all other allegations in this Paragraph 20 are hereby denied.**

21.     Ms. Ray declined to execute the Equity Purchase Agreement, her stated reason being that she did not wish to become an employee of Emage rather than an independent contractor.

**Denied.**

22.     After Ms. Ray declined to execute the Equity Purchase Agreement, Emage and Ms. Ray reached a second verbal agreement (the "Second Verbal Agreement"), under which:

**Defendants deny the existence and enforceability of any alleged verbal agreement. Except as expressly admitted herein, all other allegations in this Paragraph 22 are denied.**

a.     Mr. Ray would begin to run day to day operations of Emage as CEO on September 1, 2022.

**Defendants admit that Ms. Ray and Emage agreed that Ms. Ray was to run day-to-day operations of Emage as titular CEO starting on September 1, 2022. Except as expressly admitted herein, all other allegations in this subparagraph 22(a) are denied.**

b.     Mr. Wallace would semi-retire.

**Denied.**

c.     Beginning in September of 2022, Emage would pay Ms. Ray a consulting fee of $1,000.00 per week, an increased commission schedule and 7% of net profits distributed quarterly.

**Defendants admit that she and Plaintiff agreed that Plaintiff would pay her a raise. Except as expressly admitted herein, all other allegations in this Paragraph 22(c) are denied.**

**Except as expressly admitted herein, all allegations in Paragraph 22 and all it subparts are denied.**

23.     On September 1, 2022, Ms. Ray did begin serving as CEO of Emage and Emage did begin paying her $1,000.00 per week, an increased commission schedule and 7% of net profits.

**Defendants deny that at any point Ms. Ray served as actual CEO. Ms. Ray admits that on September 1, 2022, she began serving as titular CEO and Emage began paying her the agreed-upon raise. Except as expressly admitted herein, all other allegations in this Paragraph 23 are denied.**

24.     After Ms. Ray became the CEO, gross sales and net profits of Emage began to markedly decrease.

**Defendants deny that at any point Ms. Ray served as actual CEO. Defendants deny that gross sales of Emage decreased during her tenure as titular CEO. Defendants lack sufficient information as form a belief as to the truth or falsity of the allegations regarding net profits and thus denies the same. Except as expressly admitted herein, all other allegations in this Paragraph 24 are denied.**

25.     When confronted by Mr. Wallace about the decrease, Ms. Ray declined to take responsibility or reverse it.

**Denied.**

26.     Throughout 2023, Emage's sales and profits continued to decline.

**Defendants deny that throughout 2023, Emage's sales declined. Regarding whether throughout 2023, Emage's profits declined, Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of this allegations and thus deny the same.**

27.     Due to the great decrease in sales and profit, in January of 2024, Emage and Ms. Ray verbally agreed that she would return to the original compensation schedule in the First Ray ICA.

**Denied.**

28.     In January of 2024, Mr. Wallace returned to managing day-to-day operations and Ms. Ray returned to her original sales role.

**Denied.**

29.     On January 13, 2025, Emage and Ms. Ray executed a new independent contractor agreement (the "Second Ray ICA") that aligned with the sales role she had reassumed the previous year.

**Defendants admit that Ms. Ray executed the "Second Ray ICA" but deny its validity and enforceability. Except as expressly admitted herein, all other allegations in this Paragraph 29 are denied.**

30. Emage's motivation in entering the Second Ray ICA was to incentivize Ms. Ray to hire more salespeople whom she would manage to increase Emage's revenues and profit.

**Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in this Paragraph 30, and thus deny the same.**

31. A true copy of the Second Ray ICA is attached hereto as Exhibit "B" and incorporated herein by reference.

**Defendants admit that Exhibit B purports to be an Independent Contractor Agreement between Emage Medical LLC and Cari Ray but denies its validity and enforceability and any incorrect conclusions Plaintiff attempts to draw from Exhibit B. Except as expressly admitted herein, all other allegations in this Paragraph 31 are hereby denied.**

32. The First Ray ICA, the Second Ray ICA contained a set of restrictive covenants (the "NCAs") that precluded her from competing with Emage, soliciting Emage employees and soliciting the Emage Customers and the Emage Suppliers.

**Defendants admit that Exhibits A and B to the Complaint speak for themselves but deny their validity and enforceability and any incorrect conclusions the Plaintiff attempts to draw from them.**

33.     Like the First Ray ICA, the Second Ray ICA also contained a confidentiality provision (the "Confidentiality Provision") that restricted Ms. Ray's use or disclosure of the Emage Confidential Information.

**Defendants admit that Exhibit B to the Complaint speaks for itself but deny its validity and enforceability and any incorrect conclusions the Plaintiff attempts to draw therefrom.**

34.     Ms. Ray did not hire more salespeople and increase Emage's revenues and profits.

**Denied.**

### Alleged FDA Violations

35.     Because it sells medical devices, Emage is subject to the authority of the Federal Drug Administration (the "FDA").

**Admitted.**

36.     The FDA conducts short-notice inspections to ensure companies like Emage comply with federal regulations.

**Admitted.**

37.     In March of 2023, while Ms. Ray was acting as CEO, the FDA conducted a short-notice inspection of Emage that resulted in the issuance of several notices of noncompliance (collectively, the "FDA Violations").

**Admitted.**

38.     The FDA Violations resulted from Emage's failures to have adequate processes in place to comply with FDA regulations under Ms. Ray's tenure as CEO.

**Denied.**

39.     After receipt of the FDA Violations, Ms. Ray promise Mr. Wallace that she would oversee the corrective action (the "Corrective Actions") necessary to bring Emage into FDA compliance.

**Defendants admit that Ms. Ray informed Mr. Wallace she would do the best she could with the tools provided to her to take the Corrective Actions.  Except as expressly admitted herein, all other allegations in this Paragraph 39 are denied.**

40.     Ms. Ray represented to Mr. Wallace that it would require an additional four hours per day of her time to institute the Corrective Actions.

**Admitted on information and belief.**

41.     In response, Mr. Wallace agreed to significantly increase Ms. Ray's compensation and to hire her son to help her.

**Denied.**

42.     In July of 2023, Mr. Wallace began having weekly meetings with Ms. Ray to ensure that she was performing the Corrective Actions.

**Denied.**

43.     At each meeting, Ms. Ray represented to Mr. Wallace that she was progressing with the Corrective Actions and would complete them by the deadline set by the FDA.

**Admitted.**

44.     In December of 2023, Ms. Ray told Mr. Wallace that she had provided Emage employee Suzi Hinkle ("Ms. Hinkle") with the documentation necessary to fully implement the Corrective Actions.

**Denied.**

45.     In January of 2024, Mr. Wallace learned from Ms. Hinkle that Ms. Ray had never provided Ms. Hinkle with said documentation.

**Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in this Paragraph 45, and thus deny the same.**

46.     Concerned, Mr. Wallace conducted an inspection of Ms. Ray's files and found that that despite her repeated assurances, Ms. Ray had made no progress toward the completion of the Corrective Actions.

**Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegation that Mr. Wallace conducted an inspection of Ms. Ray's files. Except as expressly admitted herein, all allegations in this Paragraph 46 are denied.**

47.     Realizing that Ms. Ray could not, or would not, perform the Corrective Actions, Mr. Wallace asked his wife Lauren Wallace ("Ms. Wallace) to take over the task.

**Defendants deny that Ms. Ray could not or would not perform the Corrective Actions. Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegation that Mr. Wallace asked his wife to take over the task. Except as expressly admitted herein, all other allegations in this Paragraph 47 are denied.**

48.     In order to meet the compliance deadlines set by the FDA, Ms. Wallace was forced to hire a consultant to help her perform the Corrective Actions.

**Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in this Paragraph 48, and thus deny the same.**

49. In September of 2024, the FDA conducted a re-inspection of Emage and cited multiple issues of non-compliance under the FDA Violations that Ms. Wallace and her consultant were not able to correct prior to the inspection.

**Defendants admit that the FDA cited multiple issues of non-compliance during its September of 2024 inspection. Except as expressly admitted herein, all other allegations in Paragraph 49 are denied.**

50. As a result, Emage had to increase the amount of its consultant's hours, at a cost exceeding $200,000.00, in order to perform the Corrective Actions.

**Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in this Paragraph 50, and thus denies the same.**

### Allegedly Fraudulent Medical Device

51. In mid-2023, while serving as CEO, Ms. Ray represented to Mr. Wallace that she had discovered a medical device manufactured in China called the "Cytopeel", that she believed would be a profitable product for Emage to sell.

**Defendants deny that Ms. Ray ever formally served as CEO. Except as expressly admitted herein, all other allegations in this Paragraph 51 are denied.**

52. The Cytopeel is a device that cleans, exfoliates, and hydrates the skin.

**Admitted.**

53.     Ms. Ray told Mr. Wallace that a Chinese company called ADSS manufactured the Cytopeel.

**Admitted.**

54.     Ms. Ray told Mr. Wallace that her contact with ADSS was a Chinese citizen who purported to represent ADSS (the "Chinese Representative").

**Denied.**

55.     Mr. Wallace was suspicious of the Chinese Representative because he had a gmail account rather than a business email account.

**Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in this Paragraph 55, and thus deny the same.**

56.     To allay his suspicions, Mr. Wallace asked Ms. Ray to verify that the Chinese Representative did in fact represent ADSS and that ADSS was in fact the manufacturer of the Cytopeel that Ms. Ray wanted Emage to sell.

**Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in this Paragraph 56, and thus deny the same.**

57.     In response, Ms. Ray represented to Mr. Wallace that she had verified with ADSS that the Chinese Representative was employed by ADSS and that ADSS was the manufacturer of the Cytopeel.

**Denied.**


58.     In reliance upon Ms. Ray's representations, Mr. Wallace approved the purchase and distribution of the Cytopeel by Emage.

**Defendants lack sufficient knowledge or information as to form a belief as to the truth or falsity of the allegation of the claim that Mr. Wallace approved the purchase and distribution of Cytopeel by Emage based on Ms. Ray's representations.  Defendants admit that Mr. Wallace approved the purchase and distribution of Cytopeel by Emage.  Except as expressly admitted herein, all other allegations in this Paragraph 58 are hereby denied.**


59.     Without Mr. Wallace's knowledge or authority, Ms. Ray purchased supplies (the "Cytopeel Supplies") for the Cytopeel at great expense and in far greater quantity than was needed to service potential purchases of the device.

**Denied.**


60.     Ultimately, Emage sold fifty-one Cytopeels to Emage Customers.

**Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in this Paragraph 60, and thus deny the same.**

61. Purchasers of the Cytopeel began complaining that the devices were not functioning properly.

**Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in this Paragraph 61, and thus deny the same.**

62. Emage contacted the Chinese Representative for help with the malfunctioning Cytopeels.

**Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in this Paragraph 62, and thus deny the same.**

63. Despite repeated requests from Emage, the Chinese Representative failed and refused to provide Emage with service and parts manuals for the Cytopeels that Emage needed to service the devices.

**Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in this Paragraph 63, and thus deny the same.**

64. After an investigation, in February of 2025, Mr. Wallace learned that ADSS was not the manufacturer of the Cytopeel and that documentation provided by the Chinese Representative to induce their purchase was not authentic.

**Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in this Paragraph 64, and thus deny the same.**

65.     Upon information and belief, Ms. Ray knew that the ADSS was not the manufacturer of the Cytopeel and that the Chinese Representative was not an authorized representative of ADSS.

**Denied.**

66.     Alternatively, Ms. Ray acted negligently or recklessly by failing to investigate the Chinese Representative thoroughly.

**Denied.**

67.     Upon information and belief, Ms. Ray's motivation in making misrepresentations to Emage and Mr. Wallace about the Cytopeel was to earn a 7.5% commission and 10% of the profits on each unit sold.

**Defendants deny that Ms. Ray made any misrepresentations to Emage and/ or Mr. Wallace.  Defendants deny that Ms. Ray's motivation in making any representations to Emage and Mr. Wallace was to earn a 7.5% commission and 10% of the profits on each unit sold.  Except as expressly admitted herein, all other allegations in this Paragraph 67 are denied.**

68. As a result of Ms. Ray's actions, Emage:

a. Has been forced to purchase authentic Cytopeels from ADSS to replace the fifty-one fake units purchased through the Chinese Representative, at a cost of $218,025.00.

**Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in this Paragraph 68(a), and thus deny the same.**

b. Has not been able to recover its expenditures for the Cytopeel Supplies, resulting in a loss of $36,666.31.

**Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in this Paragraph 68(b) and thus deny the same.**

c. Has incurred severe damage to its reputation with the Emage Customers.

**Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in this Paragraph 68(c), and thus deny the same.**

**Except as expressly admitted herein, all other allegations in this Paragraph 68 and all its subparagraphs are denied.**

### Alleged Violation of Restrictive Covenants

69. Upon discovery of the scope of Ms. Ray's misrepresentations regarding the fake Cytopeels, Mr. Wallace directed Ms. Milazzo to terminate the Second Ray ICA.

**Defendants deny that Ms. Ray made any misrepresentation regarding the Cytopeels and denies that the Cytopeels were "fake." Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the remaining allegations contained in this Paragraph, and thus deny the same. Except as expressly admitted herein, all other**

**allegations in this Paragraph 69 are denied.**

70.     On February 21, 2025, Ms. Milazzo sent Ms. Ray a termination letter (the "Termination Letter").

**Defendants admit that Ms. Ray received a termination letter from Ms. Milazzo dated February 21, 2025. Except as expressly admitted herein, all other allegations in this Paragraph 70 are hereby denied.**

71.     A true copy of the Termination Letter is attached hereto as Exhibit "C" and incorporated herein by reference.

**Defendants admit that Exhibit C is a copy of the termination letter sent to Ms. Ray.**

72.     Among other things, the Termination Letter advised Ms. Ray that she remained subject to the NCAs and the Confidentiality Provision set forth in the Second Ray ICA.

**Defendants admit that the document speaks for itself but deny any incorrect conclusions Plaintiff attempts to draw therefrom. Except as expressly admitted herein, all other allegations in this Paragraph 72 are hereby denied.**

73. Upon information and belief, upon her receipt of the Termination Letter, Ms. Ray accessed Emage's confidential data base to download several items specifically defined as Confidential Information in the Confidentiality Provision of the Second Ray ICA, including: financial, operational, personnel, sales, marketing, customer lists, and pricing information.

**Denied.**

74. Under the Confidentiality Provision, Ms. Ray is restricted from using the Confidential Information for her personal benefit.

**Defendants admit that the Second Ray ICA speaks for itself but deny any incorrect conclusions Plaintiff attempts to draw therefrom. To the extent Paragraph 74 calls for an improper legal conclusion, Defendants deny. Except as expressly admitted herein, all other allegations in this Paragraph 74 are denied.**

75. Upon information and belief, Ms. Ray formed Insight on March 31, 2025, a month after she received the Termination Letter.

**Denied.**

76. On or about May 13, 2025, Ms. Ray sent a solicitation blast email (the "Blast Email") to all of the Emage Customers on behalf of Insight.

**Denied.**

77. A true copy of the Blast Email is attached hereto as Exhibit "D" and incorporated herein by reference.

**Defendants admit that Exhibit D is an email and that it speaks for itself and deny any incorrect conclusions Plaintiff attempts to draw therefrom. Except as expressly admitted herein, all other allegations in this Paragraph 77 are hereby denied.**

78. On May 14, 2025, Ms. Wallace was notified that Ms. Ray had attempted to log onto Emage's customer relationship management system (the "CRM").

**Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in this Paragraph 78, and thus deny the same. Defendants deny any attempt to log into Emage's CRM.**

79. A true copy of the notice received by Ms. Wallace is attached hereto as Exhibit "E" and incorporated herein by reference.

**Defendants admit that Exhibit E appears to be an email to Ms. Wallace but denies any incorrect conclusions Plaintiff draws therefrom. Except as expressly admitted herein, all other allegations in this Paragraph 79 are hereby denied.**

80.     Upon information and belief, the foregoing is only one of several attempts made by Ms. Ray to obtain further Confidential Information since she received the Termination Letter.

**Defendants deny that "the foregoing" was an attempt to obtain Emage's Confidential Information. Defendants deny that Ms. Ray made any attempts to obtain Emage's Confidential Information. Except as expressly admitted herein, all other allegations in this Paragraph 80 are hereby denied.**

81.     Upon information and belief, through and with Insight, Ms. Ray:

a.     Has solicited the business of some or all of the Emage Customers.

**Defendants deny soliciting all of the Emage Customers. Except as expressly admitted herein, Defendants lack sufficient knowledge or information to form a belief as the truth or falsity of the allegations in this Paragraph 81(a) and thus deny the same.**

b.     Has solicited the business of some or all of the Emage Suppliers.

**Defendants deny soliciting all of the Emage Suppliers. Except as expressly admitted herein, Defendants lack sufficient knowledge or information to form a belief as the truth or falsity of the allegations in this Paragraph 81(b) and thus deny the same.**

c.     Has engaged Emage's chemist to replicate Emage's products and sell them through Insight.

**Denied.**

d.     ls selling the same products that Emage sells, using the Confidential Information to undercut Emage's prices.

**Denied.**

e.      Is directly competing with Emage

**Denied.**

**Except as expressly admitted herein, Defendants deny all allegations in this Paragraph 81, including all subparts.**

82.     The foregoing actions of Ms. Ray and Insight are in direct violation of the NCAs and Confidentiality Provision contained in the Second Ray ICA.

**Defendants deny any violations of any valid and enforceable agreement. Except as expressly admitted herein, all other allegations in this Paragraph 82 are hereby denied.**

83.     Insight is vicariously liable for the actions of Ms. Ray through *respondeat superior.*

**Denied.**

## First Cause of Action
### (Breach of Contract-Second Verbal Agreement)
#### *Against Ms. Ray*

84.     The preceding allegations are incorporated herein by reference.

**Defendants reallege and reincorporate by reference all previous responses, answers, and defenses as if fully set forth herein.**

85.     The Second Verbal Agreement is an enforceable contract between Ms. Ray and Emage.

**Defendants deny the existence of a Second Verbal Agreement and to the extent any such an "Agreement" exists, deny its validity and enforceability. Except as expressly admitted herein, all other allegations in this Paragraph 85 are denied.**

86.     Ms. Ray has breached the Second Verbal Agreement in the following ways, among others:

a.      Mismanaging Emage as CEO, resulting in drastic reductions its revenues and profits.

**Denied.**

b.      Failing to properly perform the Corrective Actions required by the FDA.

**Denied.**

c.      Participating intentionally, recklessly, or negligently in the scheme to purchase and sell the fraudulent Cytopeel to the Emage Customers.

**Denied.**

d.      Purchasing the Cytopeel Supplies.

**Denied.**

**Except as expressly admitted herein, Defendants deny all the allegations in Paragraph 86 and all its subparts.**

87.     As a result of Ms. Ray's breach of the Second Verbal Agreement, Emage has

incurred incidental, direct, and consequential damages including lost profit in a sum exceeding

$25,000.00.

**Denied.**


## Second Cause of Action
### (Breach of Contract-Second Ray ICA)
*Against Ms. Ray and Insight*

88.     The preceding allegations are incorporated herein by reference.

**Defendants reallege and reincorporate by reference all previous responses, answers,**

**and defenses as if fully set forth herein.**


89.     The Second Ray ICA is an enforceable agreement between Ms. Ray and Emage.

**Denied.**


90.     Ms. Ray has breached the Second Ray ICA in the following ways, among others:

a.      By violating the Confidentiality Provision.

**Denied.**


b.      By violating the NCAs.

**Denied.**

**Except as expressly admitted herein, Defendants deny all allegations in Paragraph 90**

**and all its subparts.**

91.     Insight is vicariously liable for the actions of Ms. Ray through *respondeat superior.*

**Denied.**


92.     As a proximate result of Ms. Ray's breach of the Second Ray ICA, and/or her civil conspiracy with Insight to violate the NCAs and the Confidentiality Provision, Emage has incurred incidental, direct, and consequential damages including lost profit in a sum exceeding $25,000.00.

**Denied.**


### Third Cause of Action
**(Wrongful Interference with Contract Right)**
***Against Insight***

93.     The preceding allegations are incorporated herein by reference.

**Defendants reallege and reincorporate by reference all previous responses, answers, and defenses as if fully set forth herein.**


94.     The Second Ray ICA contains valid contract rights between Emage and Ms. Ray.

**Denied.**


95.     Insight had knowledge of the facts giving rise to the Emage's contract rights with Ms. Ray under the Second Ray ICA.

**Defendants admit that Insight, through Ms. Ray, was aware of the Second Ray ICA but denies the validity and enforceability of the same. Except as expressly admitted herein, all other allegations in this Paragraph 95 are hereby denied.**

96. Insight intentionally induced Ms. Ray to breach her obligations to Emage under the Second Ray ICA.

**Defendants deny that Ms. Ray had any legally enforceable obligations to Emage under the Second Ray ICA. Defendants deny that Insight intentionally induced Ms. Ray to breach any contractual obligation. Except as expressly admitted herein, all other allegations in this Paragraph 96 are hereby denied.**

97. Insight has benefited from Ms. Ray's breach of her obligations to Emage under the Second Ray ICA.

**Defendants deny that Ms. Ray breached any enforceable contractual obligation to Emage. Except as expressly admitted herein, all other allegations in this Paragraph 97 are denied.**

98. Insight's actions are without justification.

**Denied.**

99. As a result of Insight's actions, Emage has incurred incidental, direct, and consequential damages including lost profit in a sum exceeding $25,000.00.

**Denied.**

## Fourth Cause of Action
### (Fraud)
#### *Against Ms. Ray*

100.    The preceding allegations are incorporated herein by reference.

**Defendants reallege and reincorporate by reference all previous responses, answers, and defenses as if fully set forth herein.**

101.    Ms. Ray made the following false representations (the "Misrepresentations") to Mr. Wallace and Emage:

a.    That she was performing the Corrective Actions required by the FDA in response to the FDA Violations.

**Defendants admit that Ms. Ray made this representation but deny that it was false. Except as expressly admitted herein, all other allegations in this subparagraph 101(a) are hereby denied.**

b.    That the Chinese Representative was the authorized representative of ADSS.

**Defendants admit that Ms. Ray made this representation but denies that she knew at the time it was false.**

c.    That ADSS was the manufacturer of the Cytopeel.

**Defendants admit that Ms. Ray made this representation but denies that she knew at the time it was false.**

**Except as expressly admitted herein, Defendants deny all allegations in Paragraph 101 and all its subparagraphs.**

102.    Upon information and belief, the Misrepresentations were reasonably calculated by Ms. Ray to deceive Mr. Wallace and Emage.

**Defendants deny that Ms. Ray knowingly made any misrepresentations.  Defendants deny that Ms. Ray made any statement calculated to deceive Mr. Wallace and/or Emage. Except as expressly admitted herein, all other allegations in this Paragraph 102 are denied.**

103.    Upon information and belief, Ms. Ray intended to deceive Mr. Wallace and Emage such that Emage would act upon the Misrepresentations.

**Defendants deny that Ms. Ray deceived Mr. Wallace. Except as expressly admitted herein, all other allegations in this Paragraph 103 are denied.**

104.    Mr. Wallace and Emage were in fact deceived by the Misrepresentations and acted upon them by authorizing Ms. Ray to sell the fake Cytopeels through Emage to the Emage Customers.

**Defendants deny that Ms. Ray knowingly made any misrepresentations to Mr. Wallace and/or Emage. Ms. Ray denies that the Cytopeels sold were "fake."  Except as expressly admitted herein, Defendants lack sufficient knowledge or information to form an opinion as to the truth or falsity of the allegations in this Paragraph 104 and thus deny the same.**

105.    Mr. Wallace and Emage acted reasonably in relying upon Ms. Ray's Misrepresentations.

**Denied.**

106. Emage has suffered damages proximately caused by Ms. Ray's Misrepresentations, including loss of profits, in a sum exceeding $25,000.00.

**Denied.**

107. Emage is entitled to an award of punitive damages against Ms. Ray pursuant to Chapter 1D of the North Carolina General Statutes.

**Denied.**

### Fifth Cause of Action
**(Negligent *Representation-alternatively*)**
***Against Ms. Ray***

108. The preceding allegations are incorporated herein by reference.

**Defendants reallege and reincorporate by reference all previous responses, answers, and defenses as if fully set forth herein.**

109. In the course of her work with and for Emage, Ms. Ray supplied the following false information (the "False Information") to Mr. Wallace and Emage:

a. That she was performing the Corrective Actions required by the FDA in response to the FDA Violations.

**Defendants admit making this statement but deny that this statement was false.**

b. That the Chinese Representative was the authorized representative of ADSS.

**Defendants admit making this statement but deny knowledge at the time that it was false.**

c. That ADSS was the manufacturer of the Cytopeel.

Defendants admit making this statement but deny knowledge at the time that it was false.

Except as expressly admitted herein, Defendants deny all allegations in Paragraph 109 and all its subparts.

110.    Upon information and belief, Ms. Ray intended for Mr. Wallace and Emage to rely on the False Information.

Defendants admit that Ms. Ray intended for Mr. Wallace and Emage to rely on certain statements she made but denies knowledge at the time that such statements were incorrect.  Except as expressly admitted herein, all other allegations in this Paragraph 110 are hereby denied.

111.    The False Information was in fact, false.

Denied.

112.    Ms. Ray failed to exercise reasonable care or competence in obtaining and communicating the False Information to Mr. Wallace and Emage.

Denied.

113.    Mr. Wallace and Emage justifiably relied upon the False Information.

Defendants lack sufficient knowledge or information to form a belief as to the truth or falsity of the allegations contained in this Paragraph, and thus deny the same.

114.    As a proximate cause of its reliance upon the False Information, Emage incurred financial damages in a sum exceeding $25,000.00.

**Denied.**


## Sixth Cause of Action
### (Unfair Trade Practice)
#### *Against Ms. Ray*

115.    The preceding allegations are incorporated herein by reference.

**Defendants reallege and reincorporate by reference all previous responses, answers, and defenses as if fully set forth herein.**


116.    Upon information and belief, Ms. Ray committed the following acts in violation of Chapter 75 of the North Carolina General Statutes:

a.      Persuading Mr. Wallace to semi-retire by promising to act as Emage's CEO.

**Denied.**

b.      While acting as CEO, funneling the majority of Emage's profits to herself.

**Denied.**

c.      Deceiving Mr. Wallace about her performance of the Corrective Actions to harm Emage's reputation with the FDA.

**Denied.**

d.      Deceiving Mr. Wallace regarding the authenticity of the Cytopeel in order to make commissions.

**Denied.**

e.    Destroy Emage's reputation and goodwill in order to poach the Emage Customers and Emage Suppliers and enrich Insight.

**Denied.**

**Defendants deny all allegations in Paragraph 116 and all its subparts.**

117.    Ms. Ray's conduct was in commerce.

**Denied.**

118.    Ms. Ray's conduct proximately caused injury to Emage's business.

**Denied.**

119.    Insight is vicariously liable for the actions of Ms. Ray through *respondeat superior.*

**Denied.**

120.    As a result of Ms. Ray's actions, Emage suffered actual damages, including but not limited to lost profit, in a sum exceeding $25,000.00.

**Denied.**

121.    Emage is entitled to treble damage and an award of attorney fees pursuant to Chapter 75 of the North Carolina General Statutes.

**Denied.**

## Prayer for Relief

WHEREFORE, Defendants respectfully request that:

1.      The Court dismiss all Emage's causes of action with prejudice;

2.      The Court enter judgment against Emage and in favor of Defendants;

3.      The Court tax attorney's fees and costs to Emage pursuant to Chapter 75 and as otherwise permissible by law;

4.      The matter be tried before a jury; and

5.      The Court award such other and further relief as the Court may deem just and proper.

## Defendants' Affirmative Defenses

### First Affirmative Defense
### Failure to State a Claim

As set forth herein and in a separate motion, Defendants move to dismiss Plaintiff's Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

### Second Affirmative Defense
### Statute of Limitations

Some or all of Plaintiff's claims are barred, in whole or in part, by the applicable statutes of limitation and any other applicable time bars.

### Third Affirmative Defense
### Lack of Enforceable Contract

Plaintiff's claim for breach of contract as to the Second Independent Contractor Agreement fails because such "Agreement" is invalid and unenforceable. Plaintiff's claims based on the restrictive covenants, including any alleged noncompetition, nonsolicitation, supplier restriction, and confidentiality provisions, are barred because such restrictions are void, invalid, unreasonable, overbroad, unsupported by adequate consideration, greater than necessary to protect any legitimate business interest, or otherwise unenforceable under applicable law.

### Fourth Affirmative Defense
### Lack of Consideration

Plaintiff's contract-based claims are barred to the extent the agreements on which Plaintiff relies, including the alleged "Verbal Agreements" and the First and Second Ray ICAs are not supported by valid consideration, in whole or in part.

### Fifth Affirmative Defense
### Prior Material Breach by Plaintiff

Plaintiff's claims are barred, in whole or in part, by Plaintiff's own prior material breaches of the parties' agreements, including but not limited to failures to pay compensation, commissions, profit distributions, and/or other amounts owed to Defendant Ray.

## Sixth Affirmative Defense
### Waiver

Plaintiff's claims are barred, in whole or in part, by waiver because Plaintiff knowingly accepted, approved, ratified, condoned, or failed timely to object to the conduct of which it now complains.

## Seventh Affirmative Defense
### Estoppel

Plaintiff's claims are barred, in whole or in part, by equitable estoppel to the extent Plaintiff, through its words, conduct, omissions, approvals, and course of dealing, induced Defendants reasonably to act or refrain from acting, and Plaintiff cannot now take a contrary position to Defendants' prejudice.

## Eighth Affirmative Defense
### No Protectable Confidential Information

Plaintiff's claims based on alleged confidential information are barred, in whole or in part, because the information at issue does not constitute protectable confidential or proprietary information, was generally known or readily ascertainable, was not treated as confidential by Plaintiff, was not subject to enforceable restrictions, and/or was not misused by Defendants.

## Ninth Affirmative Defense
### Lack of Reasonable or Justifiable Reliance

Plaintiff's fraud-based and misrepresentation-based claims are barred because Plaintiff did not reasonably or justifiably rely on any alleged statement, omission, or representation by Defendants.

## Tenth Affirmative Defense
### No Intent to Deceive

Plaintiff's fraud claim is barred because Defendants did not knowingly make any false statement, did not act with intent to deceive, and did not act with the scienter required to support a fraud claim.

## Eleventh Affirmative Defense
### Conduct Not in or Affecting Commerce

Plaintiff's claim under Chapter 75 fails because the acts alleged do not constitute unfair or deceptive acts or practices in or affecting commerce within the meaning of N.C. Gen. Stat. § 75-1.1.

## Thirteenth Affirmative Defense
### Mere Breach of Contract and No Substantial Aggravating Circumstances

Plaintiff's Chapter 75 claim is barred because the allegations, at most, sound in contract, employment, compensation, and internal business disputes, and do not allege substantial aggravating circumstances sufficient to support a claim under Chapter 75.

## Fourteenth Affirmative Defense
### Intra-Corporate Immunity

Plaintiff's conspiracy-based tort claims are barred, in whole or in part, because a party cannot conspire with itself.

## Fifteenth Affirmative Defense
## Justification and Privilege to Compete

Plaintiff's claims against Insight are barred because any actions taken by Insight and/or Ms. Ray were justified, privileged, undertaken in good faith, and/or constituted lawful competition rather than actionable interference.

## Sixteenth Affirmative Defense
## Failure to Mitigate

Plaintiff's claims are barred, in whole or in part, by Plaintiff's failure to mitigate its alleged damages.

## Seventeenth Affirmative Defense
## Setoff, Recoupment, and Offset

Any recovery by Plaintiff must be reduced or barred by the doctrines of setoff, recoupment, offset, and/or credit for amounts Plaintiff owes Defendant Ray.

## Eighteenth Affirmative Defense
## Punitive Damages Barred or Limited

Plaintiff's request for punitive damages is barred or limited because punitive damages are unavailable absent liability for compensatory damages and proof, by clear and convincing evidence, of fraud, malice, or willful or wanton conduct as required by N.C. Gen. Stat. § 1D-15.

**Nineteenth Affirmative Defense**
**Attorney's Fees Not Recoverable Except as Authorized by Law**

Plaintiff is not entitled to recover attorney's fees except to the limited extent expressly authorized by statute and proven in accordance with the applicable statutory requirements, including, as to Chapter 75, the findings required by N.C. Gen. Stat. § 75-16.1.

**Twentieth Affirmative Defense**
**Intervening and Superseding Cause**

Plaintiff's claims are barred, in whole or in part, because any alleged injury or damage was caused by the acts, omissions, decisions, failures, or misconduct of Plaintiff and/or third parties, constituting intervening or superseding causes.

**Twenty-First Affirmative Defense**
**No Proximate Cause**

Plaintiff's claims are barred, in whole or in part, because no act or omission of Defendants was the direct or proximate cause of Plaintiff's alleged injury or damages.

**Twenty-Second Affirmative Defense**
**Economic Loss Rule**

Plaintiff's tort-based claims are barred, in whole or in part, by the economic loss rule to the extent Plaintiff seeks to recover in tort for alleged purely economic losses arising from alleged duties that are contractual in nature.

## Twenty-Third Affirmative Defense
## Insufficient Particularity

Plaintiff's fraud-based allegations are barred, in whole or in part, because they are not plead with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. The Federal Rules require a party to affirmatively state its defenses, and failure to state a claim remains preserved under Rule 12(h)(2).

## Twenty-FourthAffirmative Defense
## Contributory Negligence

Plaintiff's negligent misrepresentation claim is barred, in whole or in part, by Plaintiff's own contributory negligence, lack of due care, failure to investigate, failure to verify, or other contributory fault.

## Twenty-Fifth Affirmative Defense
## Reservation of Additional Defenses

Defendants reserve the right to assert such additional defenses as may become apparent through investigation and discovery, including by amendment as permitted by the Federal Rules of Civil Procedure.

## Counterclaims of Defendant Cari Ray

Now comes Defendant Cari Ray, and asserts the following Counterclaims against Plaintiff and Counterclaim Defendant Emage Medical LLC ("Emage")

## Facts Related to Counterclaims.

### Parties

1.      Defendant Cari Ray "Ms. Ray" is a citizen and resident of South Carolina.

2.      Plaintiff Emage is a North Carolina corporation with its principal place of business located in Mecklenburg County, North Carolina.

### Jurisdiction and Venue

3.      This Court has supplemental jurisdiction over these Counterclaims pursuant to 28 U.S.C. § 1367(a) because the Counterclaims are so related to the claims in the Complaint that they form part of the same case or controversy.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the Counterclaims occurred in this district, and Plaintiff filed this action in this district.

5.      This action was originally filed in the Superior Court of Mecklenburg County and was subsequently removed to this Court based on diversity jurisdiction.

### Employment Relationship

6.      Emage is in the business of distributing aesthetic medical supplies.

7.      Emage's owner, Lonnie Wallace, hired Ms. Ray on or about November 1, 2019.

8.   Ms. Ray worked for Emage until January 13, 2025.

9.   Ms. Ray's responsibilities included sales management, communicating with customers and distributors, managing sales representatives, working with vendors, product development coordination, regulatory compliance work, and responding to customer inquiries.

10.   Ms. Ray performed work that was central to Emage's core business operations, including generating equipment sales and managing distributor relationships.

11.   During her tenure, Ms. Ray generated a substantial portion of Emage's revenue through sales activities and distributor management.

12.   Ms. Ray was paid automatically on a consistent weekly basis without submitting invoices, and although she was eligible for commission based on sales, her base compensation did not fluctuate based on profits or true entrepreneurial risk.


## FLSA Coverage

13.   Emage is an enterprise engaged in commerce within the meaning of 29 U.S.C. § 203(s) because it sells and distributes aesthetic medical equipment and supplies that move in interstate commerce and employs workers who handle goods and materials that have traveled in interstate commerce

14.   Upon information and belief, Emage had annual gross revenues exceeding $500,000 during the relevant time period.

15.   Some of Emage's products are manufactured outside North Carolina and outside the United States.

16.   Emage regularly ships products across state lines and receives goods from vendors located in other states and foreign countries.

17.     During her employment, Ms. Ray communicated with customers and vendors located in multiple states and internationally.

18.     Ms. Ray also traveled to other states to meet with customers, distributors, and vendors in connection with Emage's sales and business operations.

19.     Emage is an employer within the meaning of the North Carolina Wage and Hour Act, N.C. Gen. Stat. § 95-25.2, and Plaintiff was an employee within the meaning of the Act who performed work for Defendant in North Carolina.

## **Misclassification**

20.     Throughout her tenure, Emage classified Ms. Ray as an independent contractor and issued her IRS Form 1099s.

21.     In reality, Ms. Ray functioned as an employee under the economic realities test because she had no opportunity for profit or loss depending on managerial skill, was not invested in Emage, worked exclusively for Emage for more than 5 years, did not have control over Emage's operations, performed work integral to Emage's business, and performed work that required no independent business initiative or specialized skill indicative of an independent contractor.

22.     Emage exercised substantial control over the manner and means of Ms. Ray's work.

23.     Emage controlled pricing, commissions, and sales strategies.

24.     Emage dictated certain sales communications, including email scripts and subject lines of emails.

25.     Ms. Ray was required to attend regular meetings, including mandatory weekly, monthly, and quarterly meetings.

26.     Ms. Ray was required to report sales activities and communications through

Emage's CRM systems.

27.     Ms. Ray used Emage's internal email systems, CRM platforms, marketing materials, and product samples.

28.     Ms. Ray did not invoice Emage for services and was instead paid through regular payroll-style payments.

29.     Emage reimbursed Ms. Ray for travel expenses incurred in performing her work.

30.     Ms. Ray did not maintain a separate business infrastructure during the relevant time period and was economically dependent on Emage.

31.     Ms. Ray did not have authority to independently set pricing, approve vendor payments, control payroll, or approve major business expenditures.

32.     Ms. Ray did not have independent authority to hire personnel without approval from Emage's owners.

33.     Emage retained the right to terminate Ms. Ray at will.

34.     Ms. Ray worked for Emage on a long-term and continuous basis from November 2019 until February 2025.

35.     Ms. Ray was misclassified as an independent contractor when she functioned as an employee of Emage.

36.     Ms. Ray's work was integral to Emage's primary business operations.

37.     Although Emage sometimes referred to Ms. Ray by the title "CEO," that title did not reflect her actual authority or duties. Ms. Ray did not have authority to hire or fire employees, approve payroll, control company finances, approve vendor payments, or set company pricing, and she could not make personnel decisions without approval from Emage's owners. Major operational decisions remained with Emage's owner Mr. Wallace. Ms. Ray's work primarily

consisted of sales activity, customer communications, distributor management, vendor coordination, and related operational tasks rather than high-level executive management. Ms. Ray lacked authority to commit the company financially or operationally.

38.     For example, on FDA paperwork, Ms. Ray's role was identified as "CEO – Honorary."

39.     Ms. Ray's work was not performed primarily as an outside salesperson. A substantial portion of Ms. Ray's work occurred remotely through email, telephone, CRM systems, and vendor communications. Ms. Ray also performed mainly administrative and operational tasks, including sales management, distributor coordination, regulatory compliance work, and vendor communications, rather than spending the majority of her time making sales outside of Emage's place of business.

## Hours Worked

40.     Ms. Ray regularly worked more than forty hours per week during her employment with Emage.

41.     Ms. Ray typically worked approximately 50 to 53 hours per week.

42.     Ms. Ray's typical schedule included work from approximately 10:00 a.m. to 6:00 p.m. or 7:00pm Eastern Time, along with several hours of additional evening work multiple nights per week communicating with international vendors and customers.

43.     Ms. Ray frequently worked additional hours communicating with vendors in China due to time zone differences, including calls occurring between approximately 9:30 p.m. and 11:00 p.m. Eastern Time.

44.     Ms. Ray also performed additional work outside standard hours responding to

customer inquiries, managing distributors, preparing reports, training sales staff, and handling regulatory compliance tasks.

45.     During peak sales periods, including November and December each year, Ms. Ray worked substantially longer hours in order to close year-end equipment sales.

46.     Ms. Ray also worked additional hours following the Chinese New Year period each year to coordinate with international vendors and product suppliers.

47.     For example, during the weeks preceding Chinese New Year in 2023 and 2024 (February 28 to March 6, 2023, and February 28 to March 8, 2024), Ms. Ray worked at least 10 hours per day Monday through Wednesday and at least 12 hours per day on Thursday and Friday to manage product orders and research repairs and development following the two-week Chinese New Year shutdown, during which shipping and communications with Chinese vendors ceased.

48.     Emage knew she was working these extended hours leading up to Chinese New Year because Mr. Wallace directed Ms. Ray to remain available at all times while he stopped using WhatsApp, the platform Emage used to communicate with international vendors. On several of those days, Ms. Ray sent emails to Mr. Wallace from approximately 8:00 a.m. until midnight.

49.     Ms. Ray also had to miss Thanksgiving and Christmas holiday events with her family in 2022, 2023 and 2024 because of late night conversations with customers, her team, vendors and/or distributors trying to place orders before the year end.

50.     During November of 2023 and 2024, Ms. Ray worked over 9 hours a day Monday through Friday and at least 4 hours a day on Sundays working with the international manufacturers.

51.     Ms. Ray did not receive any additional compensation for hours worked beyond forty in a workweek , and Emage did not pay Ray any overtime premium.

52.     Emage classified Ms. Ray as an independent contractor and therefore did not track Ray's overtime hours and did not pay Ray overtime compensation for hours worked in excess of forty hours per week.

53.     When Emage would ask Ms. Ray for her hours so it could prepare payroll, Mr. Wallace, despite being told by Ms. Ray that she was working more than 40 hours per week, would tell her to just put down 40 hours.

54.     Other times, Emage would not ask Ms. Ray to report her hours, but Ms. Ray did tell Mr. Wallace repeatedly that she was working 50-60 hour work weeks, demonstrated by the timing of emails and other work-related correspondence she sent to Mr. Wallace.


**Employer Knowledge of Overtime**

55.     Emage knew or should have known that Ms. Ray routinely worked more than forty hours per week.

56.     Mr. Wallace communicated with Ms. Ray during late evening hours, holidays, weekends, and even when notified that Ms. Ray would be away on vacation, regarding vendor communications and product development with Chinese suppliers.

57.     Mr. Wallace expected Ms. Ray to respond to customer leads within approximately one hour, regardless of when those leads were received.

58.     Ms. Ray regularly sent emails and communications to Mr. Wallace outside of traditional business hours.

59.     Emage benefited from Ms. Ray's overtime work but did not compensate her for those hours.

## Compensation

60.     Ms. Ray's compensation structure changed multiple times during her tenure.

61.     At various times Ms. Ray was paid through a combination of salary, commissions, and profit sharing, but her salary itself did not fluctuate based on hours worked, sales, or profit.

62.     For a substantial portion of her employment, Ms. Ray received approximately $1,000 per week in base compensation plus commissions on sales.

63.     Ms. Ray's compensation was paid regularly regardless of the number of hours she worked in a given week.

64.     Ms. Ray's compensation did not include any overtime premium for hours worked in excess of forty hours in a workweek, and Emage never paid Ms. Ray overtime compensation for hours above forty per week.

## Wage Deduction

65.     In 2023, Emage unilaterally decided that Ms. Ray would not be receiving the 3rd and 4th quarterly disbursements that Emage owed her per their agreement.

66.     In or about September 2024, Emage deducted approximately $5,000 from Ms. Ray's compensation.

67.     Emage represented that the deduction related to losses associated with certain equipment known as Cytopeel devices.

68.     The deduction was taken directly from Ms. Ray's pay, meaning it was deducted from compensation she had already earned.

69.     The deduction was not authorized in Ms. Ray's compensation agreement and was not agreed to in writing by Ms. Ray.

### Unpaid Commissions

70.     Emage represented that Ms. Ray's compensation would include 10% commissions on equipment sales she originated or closed.

71.     Ms. Ray also received override commissions on sales generated by members of her sales team.

72.     Beginning in approximately 2024, Emage unilaterally reduced Ms. Ray's commissions and override percentages.

73.     Emage reduced Ms. Ray's commission on distributor equipment sales from 10% to approximately 5%.

74.     Emage also unilaterally reduced Ms. Ray's override commissions on sales generated by her sales team from the agreed-upon 13% down to 5%.

75.     Although Emage reduced Ms. Ray's future commission and override percentages, Emage also failed to pay certain commissions and quarterly disbursements that Ms. Ray had already earned under the governing compensation structure.

76.     On January 13, 2025, during a meeting with Emage management, Ms. Ray complained about the unilateral reductions to her compensation, including reductions to her commissions and override commissions. Ms. Ray told Emage that the reductions to her commissions, override commissions, and pay were unlawful and that she was owed wages that had not been paid.

77.     During that meeting, Emage informed Ms. Ray that if she did not sign a new Independent Contractor Agreement (the "Second Ray ICA"), she would be terminated.

78.     Ms. Ray signed the Second Ray ICA under that pressure, and shortly thereafter, on February 21, 2025, Emage notified Ms. Ray that her employment was terminated as of that same day, January 13, 2026.

**First Cause of Action**
**FLSA Misclassification**
29 U.S.C. § 201 *et seq.*

79.     Ms. Ray repeats and realleges the foregoing allegations as if fully set forth herein.

80.     The FLSA requires employers to pay employees overtime compensation for hours worked in excess of forty hours per week.

81.     As set forth herein, Ms. Ray was an employee of Emage within the meaning of the FLSA.

82.     Emage misclassified Ms. Ray as an independent contractor.

83.     Under the economic realities test, Ms. Ray was economically dependent on Emage and subject to Emage's control.

84.     Emage's misclassification of Ms. Ray deprived her of overtime protections required by the FLSA.

85.     Because Emage classified Ms. Ray as an independent contractor, Emage did not track Ms. Ray's overtime hours and did not compensate Ms. Ray at an overtime rate for hours worked in excess of forty in a workweek.

86.     As a result of this misclassification, Ms. Ray was denied wages to which she was legally entitled.

87.     As set forth herein, Emage knew or showed reckless disregard for whether its compensation practices violated the FLSA, rendering its violations willful within the meaning of 29 U.S.C. § 255(a).

88.     As a result of Emage's willful violations, Ms. Ray is entitled to recover damages for a three-year period preceding the filing of these Counterclaims pursuant to 29 U.S.C. § 255(a).

89.     As a result of Emage's conduct, Ms. Ray is entitled to recover unpaid wages, liquidated damages, and attorneys' fees pursuant to 29 U.S.C. § 216(b).

**Second Cause of Action**
**Unpaid Overtime**
29 U.S.C. § 207

90.     Ms. Ray repeats and realleges the foregoing allegations as if fully set forth herein.

91.     As set forth herein, Ms. Ray routinely worked in excess of forty hours per week.

92.     Emage did not pay Ms. Ray overtime compensation for hours worked in excess of forty hours per week.

93.     As set forth herein, Emage knew or should have known that Ms. Ray was working overtime hours.

94.     Emage therefore violated the overtime provisions of the Fair Labor Standards Act, 29 U.S.C. § 207.

95.     As a result of Emage's violations, Ms. Ray is entitled to recover unpaid overtime wages, liquidated damages, and attorneys' fees.

**Third Cause of Action**
**Unlawful Wage Deduction**

96.     Ms. Ray repeats and realleges the foregoing allegations as if fully set forth herein.

97.     Emage deducted approximately $5,000 from Ms. Ray's compensation.

98.     The deduction was not authorized by Ray and was not permitted under the governing compensation agreement.

99.     The deduction constitutes an unlawful withholding of wages.

100.    As a result, Ms. Ray is entitled to recover the improperly withheld wages together with all available statutory remedies.

## Fourth Cause of Action
### Unpaid Commissions

101.    Ms. Ray repeats and realleges the foregoing allegations as if fully set forth herein.

102.    Ms. Ray earned commissions on equipment and distributor sales under the compensation structure governing her work.

103.    Emage failed to pay certain commissions and quarterly disbursements that Ms. Ray had already earned under the compensation structure governing her work

104.    These earned commissions constituted wages earned by Ms. Ray under her compensation agreement and Emage's failure to pay them violated the North Carolina Wage and Hour Act, N.C. Gen. Stat. § 95-25.

105.    As a result of Emage's actions, Ms. Ray has suffered damages including unpaid commissions and related compensation.

## Fifth Cause of Action
### (In the Alternative to Counts 1-4)
### Breach of Contract

106.    Ms. Ray repeats and realleges the foregoing allegations as if fully set forth herein.

107.    At the time Ms. Ray began working for Emage, the parties entered into an Independent Contractor Agreement governing Ms. Ray's compensation.

108.    The Agreement set out the percentages of commissions to which Ms. Ray was entitled.

109.     Beginning in approximately 2024, Emage unilaterally reduced Ms. Ray's commissions on distributor equipment sales and reduced her commissions on sales generated by her team.

110.     The Agreement did not permit Emage to withhold commissions or quarterly disbursements that Ms. Ray had already earned under the compensation structure.

111.     Emage's unilateral reduction of Ms. Ray's commissions constituted a breach of the Agreement.

112.     As a result of Emage's breach, Ms. Ray has suffered damages including unpaid commissions.

113.     This claim is pleaded in the alternative to Ms. Ray's claim that she was an employee under the Fair Labor Standards Act.

**Sixth Cause of Action**
**Violation of the North Carolina Wage and Hour Act**
N.C. Gen. Stat. § 95-25.8

114.     Ms. Ray repeats and realleges the foregoing allegations as if fully set forth herein.

115.     As set forth herein, at all relevant times, Emage employed Ms. Ray within the meaning of the North Carolina Wage and Hour Act.

116.     Ms. Ray earned wages in the form of commissions on equipment sales and override commissions on sales generated by members of her sales team.

117.     These earned commissions constituted wages within the meaning of N.C. Gen. Stat. § 95-25.2(16).

118.     Beginning in approximately 2024, Emage failed to pay certain commissions and quarterly disbursements that Ms. Ray had already earned under the governing compensation structure.

119.    Emage also deducted approximately $5,000 from Ms. Ray's earned compensation in or around September 2024.

120.    The deduction was not authorized in writing by Ms. Ray.

121.    By failing to pay Ms. Ray earned commissions and by making an unauthorized deduction from Ms. Ray's wages, Emage violated the North Carolina Wage and Hour Act, including N.C. Gen. Stat. §§ 95-25.6 and 95-25.8.

122.    As a result of these violations, Ms. Ray is entitled to recover unpaid wages together with all remedies available under the North Carolina Wage and Hour Act, including attorneys' fees and costs.

### Seventh Cause of Action
### Retaliation in Violation of the Fair Labor Standards Act
### 29 U.S.C. § 215(a)(3)

123.    Ms. Ray repeats and realleges the foregoing allegations as if fully set forth herein.

124.    The Fair Labor Standards Act prohibits an employer from discharging or otherwise retaliating against an employee because the employee has complained about violations of the Act or asserted rights protected by the Act.

125.    During a meeting on January 13, 2025, Ms. Ray complained to Emage that the company had failed to pay wages owed to her, including commissions and other compensation she had already earned, and that Emage had improperly deducted compensation from her pay, and she informed Emage that these actions were unlawful and violated applicable wage laws

126.    Ms. Ray's complaints constituted protected activity under the Fair Labor Standards Act.

127.    After Ms. Ray raised these complaints, Emage informed her that she would be terminated if she did not sign a new Independent Contractor Agreement.

128.    Ms. Ray signed the Second Ray ICA under pressure from Emage.

129.    Emage terminated Ms. Ray, effective that same day.

130.    On information and belief, Emage terminated Ms. Ray because she complained about unlawful reductions to her compensation and other wage violations.

131.    Emage's actions constitute unlawful retaliation in violation of 29 U.S.C. § 215(a)(3).

132.    As a direct and proximate result of Emage's retaliation, Ms. Ray has suffered damages including lost wages, lost compensation, and other economic losses.

133.    Ms. Ray is entitled to recover damages, liquidated damages, and attorneys' fees pursuant to 29 U.S.C. § 216(b).


### **Prayer for Relief**

WHEREFORE, Defendant and Counterclaim Plaintiff Cari Ray respectfully requests that:

1.      The Court declare that Plaintiff shall have and recover nothing of Ms. Ray;

2.      The Court enter judgment in Ms. Ray's favor on her Counterclaims;

3.      The Court award Ms. Ray all unpaid wages, commissions, and other compensation owed to her;

4.      The Court award Ms. Ray liquidated damages as permitted by the Fair Labor Standards Act;

5.      The Court award Ms. Ray all damages available under the North Carolina Wage and Hour Act;

6. The Court award Ms. Ray her reasonable attorneys' fees and costs as permitted by law;

7. The Court award Ms. Ray pre-judgment and post-judgment interest;

8. The Court award Ms. Ray such equitable relief as the Court deems appropriate, including reinstatement or front pay in lieu of reinstatement;

9. All issues of fact be determined by a jury; and

10. The Court grant such other and further relief as the Court deems just and proper.

This, the 13th day of March, 2026

## HULL & CHANDLER

By: */s/ Elizabeth Vennum*
Elizabeth Vennum
N.C. State Bar No. 49747
Hull & Chandler
1009 East Boulevard
Charlotte, NC 28203
Tel. (704) 375-8488
Fax (704) 375-8487
lvennum@lawyercarolina.com
*Counsel for Defendants*

## Certificate of Service

This is to certify that on this date the undersigned filed the foregoing using the Court's CM/ECF system and served it on all counsel of record by mail as below indicated, with a courtesy copy sent by email to counsel not registered with ECF:

> Jordan LaTorre
> David Redding
> 2901 Providence Road, Suite 303
> Charlotte, North Carolina 28211
> (704) 900-2215
> jlatorre@tlg-law.com
> dredding@tlg-law.com
> *Counsel for Plaintiff*

This, the 13th day of March, 2026

## HULL & CHANDLER

By: */s/ Elizabeth Vennum*
Elizabeth Vennum
N.C. State Bar No. 49747
Counsel for Defendant
Hull & Chandler
1009 East Boulevard
Charlotte, NC 28203
Tel. (704) 375-8488
Fax (704) 375-8487
lvennum@lawyercarolina.com