**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**Civil Action No.: 3:26-cv-00157**

| | |
|---|---|
| EMAGE MEDICAL, LLC, | |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS** |
| v. | |
| INSIGHT INNOVATION PARTNERS, LLC and CARI RAY. | |
| Defendants. | |

NOW COMES Plaintiff Emage Medical, LLC, ("Emage" or "Plaintiff"), by and through the undersigned counsel, and hereby submit its Memorandum of Law in Opposition to Defendants' Partial Motion to Dismiss.

## FACTS

This case arises from a dispute between Emage and Cari Ray ("Ms. Ray") and Insight Innovation Partners, LLC, ("Insight") (collectively, "Defendants"), in which Ms. Ray was a contractor Emage and immediately following her termination, Ms. Ray founded Insight, solicited Emage's customers, and began to directly compete with Emage. As a result, Emage has filed this lawsuit asserting claims of, Breach of Contract (second verbal agreement), Breach of Contract (second Ray ICA), Wrongful Interference with Contract Right, Fraud, Negligent Misrepresentation (in the alternative), and Unfair and Deceptive Trade Practices. Defendants' have filed this Motion to dismiss the breach of contract claim of the non-compete provision of the Second Ray ICA and the Unfair and Deceptive Trade Practices claim.

1

Emage was founded by Lonnie Roy Wallace ("Mr. Wallace") and is a North Carolina company that for the past eighteen years has distributed medical devices to various consumers throughout the United States. (Compl. ¶¶ 4, 11). On November 1, 2019, Emage hired Ms. Ray as a leader on its sales team, this agreement was memorialized in an independent contractor agreement (the "Frist Ray ICA"), a true and accurate copy of which is attached to the Complaint as Exhibit "A". (Compl. ¶ 7).

In 2022, Mr. Wallce and Ms. Ray made a verbal agreement for Ms. Ray to take over day to day operations of Emage as the CEO in exchange for a significant increase in her compensation. (Compl. ¶ 22). Starting on September 1, 2022, Ms. Ray took over as CEO and remained as CEO until January 2024. (Compl. ¶ 27). During Ms. Ray's tenure as CEO the profit of Emage declined significantly and Emage was given several notices of noncompliance by the Federal Drug Administration (the "FDA") for failing to comply with FDA regulations. (Compl. ¶¶ 24, 37).

In January of 2024, Mr. Wallace returned to his role as CEO of Emage and Ms. Ray returned to her role on the sales team. (Compl. ¶ 27). Emage and Ms. Ray memorialized this new agreement in a second independent contractor agreement (the "Second Ray ICA"), a true and accurate copy of which is attached to the Complaint as Exhibit "B". (Compl. ¶ 29). The Second Ray ICA contains a set of restrictive covenants (the "NCAs") that preclude Ms. Ray from competing with Emage, soliciting Emage employees, soliciting Emage customers, or Emage suppliers. (Compl. ¶ 32). The Second Ray ICA states in relevant part:

> **RESTRICTIVE COVENANTS.** Contractor covenants and agrees that, during the Term, and for a period of one (1) year form the end of the Terms, Contractor shall not engage or participate, directly or indirectly, as a principal, independent contractor, agent, employee, employer, consultant, advisor, sole proprietor, stockholder, partner, trustee, joint venture or in any other individual or representative capacity, in the conduct or management of, or own any stock or other proprietary interest in, or debt of, any business organization, person, firm, partnership, association, corporation, enterprise or other entity that shall be engaged in any business (whether in operation

2

or in the planning, research or development stage) that is a Competitive Business, or for which the Company had, prior to the date of termination, developed a written business plan in the states and/or territories of the United States, unless Contractor shall obtain the prior written consent of the Company, given in its sole discretion, which consent shall make express reference to this Agreement. Competitive business is defined as any business which competes, directly or indirectly, with sales of aesthetic equipment and supplies.

**SEVERABILITY.** If any provisions of this Agreement shall be held to be invalid or unenforceable for any reason, the remaining provisions shall continue to be valid and enforceable. If a court finds that any provision of this Agreement is invalid or unenforceable, but that by limiting such provision it would become valid and enforceable, then such provision shall be deemed to be written, construed, and enforced as so limited.

(Compl. Ex. B).

In 2023, Ms. Ray, while serving as CEO, represented to Mr. Wallace that she discovered a new medical device manufactured in China called "Cytopeel" manufactured by a Chinese company called ADSS. (Compl. ¶ 51). Mr. Wallace was skeptical of the Cytopeel and ADSS, and to mitigate his misgivings he requested that Ms. Ray verify that ADSS was in fact the manufacturer of the Cytopeel. (Compl. ¶¶ 55, 56). Ms. Ray gave Mr. Wallace documentation showing that what she had told him regarding the Cytopeel was true. (Compl. ¶ 57). Relying on Ms. Ray's representations, Mr. Wallace approved the purchases of the Cytopeel by Emage. (Compl. ¶ 58). In exchange for Ms. Ray finding and coordinating the Cytopeel deal, she would earn a 7.5% commission and 10% of the profits on each unit sold. (Compl. ¶ 67). Around the same time, Ms. Wallace using Emage's resources purchased supplies to service the Cytopeels (the "Cytopeel Supplies") in far greater quantity then needed and without the authorization of Mr. Wallace. (Compl. ¶ 59).

Emage sold fifty-one Cytopeels to various customers; shortly thereafter, the customers began to complain the Cytopeels did not function correctly. (Compl. ¶¶ 60, 61). In response to these customer complaints, Mr. Wallace investigated and discovered that ADSS was not the

3

manufacturer of the Cytopeel, and the documentation provided by Ms. Ray was not authentic. (Compl. ¶ 64). On February 21, 2025, Ms. Ray was terminated by Emage and given a termination letter (the "Termination Letter"), a true and accurate copy of which is attached to the Complaint as Exhibit "C". (Compl. ¶ 70).

Following her termination, Ms. Ray, accessed and downloaded Emage's confidential information. (Compl. ¶ 73). Shortly thereafter on March 31, 2025, Ms. Ray founded Insight, which is in the same business and operates in the same area as Emage. (Compl. ¶ 75). On May 13, 2025, Ms. Ray sent an email to all of Emage's customers soliciting business for Insight. (Compl. ¶ 76).

The Complaint in this matter was filed on January 27, 2026, in Mecklenburg County Superior Court. This case was then removed to the Western District of North Carolina on February 27, 2026. On March 13, 2026, Defendants filed this Partial Motion to Dismiss, which for the following reasons should be denied.

## **STANDARD OF REVIEW**

A complaint "does not need detailed factual allegations" to survive a 12(b)(6) motion, merely allegations that are "more than labels and conclusions, and a formulaic recitation of a cause of action's elements." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." *Id*. See also *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely"). When a court reviews a compliant upon a motion to dismiss it must disregard all allegations that are mere conclusory statements and assuming the remaining allegations are true and determine "whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A claim for relief has "facial

4

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678.

## ARGUMENT

I. **Defendants' Motion to Dismiss the Claim for Breach of Contract of the "Restrictive Covenants" Section of the Second Ray ICA should be denied.**

Under North Carolina Law, the elements for a breach of contract claim are simply: (1) the existence of a valid contract, and (2) breach of the terms of that contract. *Spirax Sarco Inc. v. SSI Engineering, Inc.*, 122 F.Supp.3d 408 (2015). However, a for non-compete agreement to be an enforceable contract it must be: (1) in writing, (2) made part of a contract of employment, (3) based on valuable consideration, (4) reasonable both as to time and territory, and (5) designed to protect a legitimate business interest of the employer. *Phillip Electronics North America Corp. v. Hope*, 631 F.Supp.2d 705, 714 (2009). (quoting *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 402-03 (1983)).

The reasonableness of the temporal and geographic restrictions of a non-compete agreement is a question of law and generally cannot be resolved on a 12(b)(6) motion absent clear facial overbreadth. *Static Control Components, Inc. v. Darkprint Imaging, Inc.*, 135 F.Supp.2d 722 (2001). "[T]he time and geographic limitations of a covenant-not-to-compete must be considered in tandem, such that a longer period of time is acceptable where the geographic restriction is relatively small, and vice versa." *Kinesis Adver., Inc. v. Hill*, 187 N.C.App. 1, 13-14, 652 S.E.2d 284, 294 (2007). North Carolina courts consider six factors when determining the reasonableness of the temporal and geographic restrictions: "(1) the area, or scope, of the restriction; (2) the area assigned to the employee; (3) the area where the employee actually worked or was subject to work; (4) the area in which the employer operated; (5) the nature of the business involved; and (6) the

nature of the employee's duty and his knowledge of the employer's business operation." *Okuma Am. Corp. v. Bowers*, 181 N.C.App. 85, 89, S.E.2d 617, 620 (2007).

As a general rule, non-compete agreements with a duration of two years have been held to be well within the range that North Carolina courts have deemed reasonable. *Keith v. Day*, 81 N.C.App. 185, 343 S.E.2d 562 (1986). The geographic scope of a non-compete is reasonable "only to the extent it protects legitimate interests of the employer in maintaining [its] costumers." *Hartman v. W.H. Odell & Assocs., Inc.*, 117 N.C.App. 307, 312 450 S.E.2d 912, 917 (1994). North Carolina courts have consistently held, the "protection of customer relations and goodwill against misappropriation by departing employees is well recognized as a legitimate protectable interest of the employer." *United Laboratories, Inc. v. Kuykendall*, 322 N.C. 643, 651, 370 S.E.2d 375, 381 (1988). Further, non-compete agreements have been held reasonably necessary to protect legitimate business interest "if the nature of the employment is such as will bring the employee in personal contact with patrons or customers of the employer, or enable him to acquire valuable information as to the nature and character of the business and the names and requirements of the patrons or customers." *A.E.P. Indus.*, Inc., 308 N.C. at 408, 302 S.E.2d at 763.

In the present case, the NCA at issue is contained within the Second Ray ICA and is in writing, as evidenced by the exhibits to the Complaint. Additionally, it was executed as part of Ms. Ray's employment agreement with Emage, and in exchange of valuable consideration. Defendants' motion only challenges the reasonableness of the time and territory restrictions and Emage's business interest in enforcing the NCA.

Ms. Ray was employed by Emage both as member of its sales team and then as CEO; the combination of which gave Ms. Ray an intimate knowledge Emage's business operation. Further, Ms. Ray knew all or most of Emage's customers. As such, a broader and more restrictive non-

compete agreement is necessary to adequately protect Emage's legitimate business interests, i.e., retaining its customers.

The NCA is broad in terms of the nature of the employment restricted, but narrow as to the employer, and the duration of time. Defendants argue the NCA restricts Ms. Ray from working as a receptionist, janitor, or delivery driver for any company that supplies or sells aesthetic equipment. However, the Complaint does not allege Ms. Ray sought employment as a janitor, driver, or receptionist; rather that she started Insight to directly compete with Emage by providing the same goods and services to Emage's customers. As shown by Ms. Ray attempting to access Emage's servers where it stores confidential information including its customer data base and Insight sending an email blast to Emage's customers. The NCA is appropriately broad due to Ms. Ray's employment as a salesperson and CEO of Emage and the niche market of aesthetic equipment sales and supply.

Further, the restrictions are for only one year following her termination from Emage, thus making the time limitation more reasonable. North Carolina courts have consistently held that two years is generally accepted as reasonable. *Keith v. Day*, 81 N.C.App. 185, 343 S.E.2d 562 (1986). Therefore, the temporal restrictions of the NCA are reasonable. Moreover, Emage has not sought an injunction to keep Ms. Ray and Insight from operating. Emage is seeking monetary relief for the damage done to its business by the actions of Ms. Ray and Insight.

In the event this Court determines the NCA portion of the Second Ray ICA is overly broad and thus unenforceable, Emage requests any order issued by this Court be limited in scope as allowed by law pursuant to Severability clause of the Second Ray ICA. Defendants' motion states, "claim for Breach of Contract as it relates to the Noncompete provision of the Second Ray ICA. .

." as such Defendants have not challenged the validity or enforceability of the remaining portions of the Second Ray ICA.

North Carolina courts have long held, "[w]hen a contract contains provisions which are severable from an illegal provision and are in no way dependent upon the enforcement of the illegal provision for their validity, such provisions may be enforced." *Rose v. Vulcan Materials Co.*, 282 N.C. 643, 658, 194 S.E.2d 521, 531-532 (1973). In the present case, Defendants have not challenged the validity of the entire Second Ray ICA, only the NCA provision. Further, the primary purpose of the Second Ray ICA was to govern Ms. Ray's work for Emage, not just the NCA provision. As such, the remainder of the Second Ray ICA is enforceable.

As discussed above, the restrictions of the NCA are not so overly broad on its face that this Court should determine it is unenforceable and dismiss the alleged breach prior to the establishment of more facts through discovery. Therefore, this Court should deny Defendants' motion to dismiss the NCA portion of the Second Ray ICA.

II.     **Defendants' Motion to Dismiss the Claim of Unfair and Deceptive Trade Practices should be denied because Plaintiff plead allegations sufficient to survive a motion to dismiss.**

North Carolina's Unfair and Deceptive Trade Practices Act ("UDTP") declares unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). To state a UDTP claim, a plaintiff must plausibly allege: (1) the defendant committed an unfair or deceptive act or practice, (2) the act or practice was in or affecting commerce, and (3) the act proximately caused injury to the Plaintiff. *Spriax Sarco, Inc. v. SSI Engineering, Inc.*, 122 F.Supp.3d 408, 422 (2015).

"A practice is deceptive if it has the tendency to deceive" and unfair when it "offends established public policy as well as when the practice is immoral, unethical, oppressive,

unscrupulous, or substantially injurious to consumers." *Gray v. North Carolina Ins. Underwriting Ass'n*, 352 N.C. 61, 68, 529 S.E.2d 676, 681 (2000). (quoting, *Marshall v. Miller*, 302 N.C. 539, 548, 276 S.E.2d 397, 403 (1981)). Additionally, "UDTP claims based on misrepresentation by the defendant generally require a showing that the plaintiff relied on the misrepresentation, leading to its injury." *D C Custom Freight, LLC v. Tammy A. Ross & Assoc., Inc.*, 273 N.C.App. 220, 227, 848 S.E.2d 552, 559 (2020).

The North Carolina general assembly has defined commerce to include "all business activities, however denominated, but does not include professional services rendered by a member of a learned profession." N.C. Gen. Stat. § 75-1.1(b). The UDTP covers two types of business transactions, "(1) interactions between businesses, and (2) interactions between businesses and consumers." *White v. Thompson*, 364 N.C. 47, 52, 691 S.E.2d 676, 679 (2010). However, the North Carolina Supreme Court has explained, "we have not limited the applicability of N.C.G.S. § 75-1.1 to cases involving consumers only. After all, unfair trade practices involving only businesses affect the consumer as well." *United Laboratories, Inc. v. Kuykendall*, 322 N.C. 643, 655, 307 S.E.2d 375, 389 (1988).

"Proof of fraud would necessarily constitute a violation of the prohibition against unfair and deceptive acts…" *Hardy v. Toler*, 288 N.C. 303, 309, 218 S.E.2d 342, 346 (1975). North Carolina Courts have continuously held that a UDTP claim and a fraud claim based on the same facts are bound together starting at the pleading stage. See *Powell v. Wold*, 88 N.C.App. 61, 362 S.E.2d 796 (1987). ("Because the claims of the plaintiff based on fraud and negligent misrepresentation have been held by this Court to be sustainable past a Rule 12(b)(6) motion to dismiss, the claim of unfair and deceptive trade practices cannot be dismissed."); *Webb v. Triad Appraisal and Adjustment Service, Inc.*, 84 N.C.App. 446, 449, 352 S.E.2d 859, 862 (1987).

9

("Since plaintiff has alleged facts which, if proven, could support a finding of fraud, she has also alleged facts which could support a finding of unfair and deceptive trade practices.").

In the present case, the Complaint alleges claims of Fraud and Unfair and Deceptive trade practices by Ms. Ray. In response, Ms. Ray has filed this motion to dismiss just the UDTP claim and not the fraud claim. North Carolina courts have held, proof of fraud in commercial setting necessarily constitutes a violation of the UDTP. *Powell*, 88 N.C.App 61, 362 S.E.2d 796 (1987). Applied here, Defendants acceptance of sufficiency of the pleadings of allegations of fraud, necessarily leads to the conclusion of the UDTP claim has been sufficiently plead as well.

Furthermore, the Complaint alleges Ms. Ray misrepresented both the efficacy and the manufacturer of the Cytopeels to Emage, who then sold those Cytopeels to its customers. The consumers who purchased those Cytopeels then complained about them to Emage. (Compl. ¶ 61). These consumer complaints show both that Ms. Ray's fraud, while internal to Emage, did in fact effect commerce and that it damaged Emage's reputation and goodwill. Ms. Ray's fraud effected commerce in that her actions led to defective Cytopeels being sold to Emage's customers. Further, those same consumers then complained to Emage about the defective Cytopeels, thus damaging Emage's reputation and goodwill amongst its customers, by making them known as a company that sells defective devices.

Ms. Ray claims that Emage has failed to allege substantial aggravating circumstances for the UDTP claim, arguing a breach of contract is insufficient. Admittedly, a mere breach of contract is insufficient for a UDTP claim; however, the Complaint, as addressed above, alleges Ms. Ray committed fraud which led to defective Cytopeels to be sold to consumers. As such, Emage has alleged facts sufficient to constitute substantial aggravating circumstances necessary to state a claim for UDTP.

10

As a result of the foregoing, Emage has plead fact sufficient to state a claim for relief under UDTP. Therefore, this Court should deny Defendants' motion to dismiss the claim of Unfair and Deceptive Trade Practices against Ms. Ray.

## **CONCLUSION:**

As a result of the foregoing, this Court should deny Defendants' Partial Motion to Dismiss Emage's claims for Breach of Contract on the non-compete provision and its claim for Unfair and Deceptive Trade Practices.

Respectfully submitted,

This the 17th day of April, 2026.

**TLG Law**

/s/ David G. Redding
Jordan M. LaTorre
NC Bar No.: 63378
David G. Redding
NC Bar No.: 24476
2907 Providence Rd., Suite 303
Charlotte, North Carolina 28211
jlatorre@tlg-law.com
dredding@tlg-law.com
*Attorneys for Plaintiff*

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that the foregoing **Plaintiff Emage Medical, LLC's Memorandum of Law in Opposition to Defendants Partial Motion to Dismiss** complies with the Court's June 18, 2024 order related to the use of Artificial Intelligence. The undersigned hereby avers as follows:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexus, FastCase, and Bloomberg; and

2. Every statement and citation to an authority contained in this document has been checked by an attorney in this case and/or paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 17th day of April, 2026.

**TLG Law**

/s/ David G. Redding
Jordan M. LaTorre
NC Bar No.: 63378
David G. Redding
NC Bar No.: 24476
2907 Providence Rd., Suite 303
Charlotte, North Carolina 28211
jlatorre@tlg-law.com
dredding@tlg-law.com
*Attorneys for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I electronically filed the foregoing **Plaintiff Emage Medical LLC's Memorandum of Law in Opposition to Defendants Partial Motion to Dismiss** with the Clerk of Cout using the CM/ECF system, which will send a copy to all counsel as follows:

HULL & CHANDLER
1009 East Boulevard
Charlotte, NC 28203
Elizabeth Vennum
lvennum@lawyercarolina.com
*Counsel for Defendants*.

This the 17th day of April, 2026.

<u>/s/ David G. Redding</u>
Jordan M. LaTorre
NC Bar No.: 63378
David G. Redding
NC Bar No.: 24476
2907 Providence Rd., Suite 303
Charlotte, North Carolina 28211
jlatorre@tlg-law.com
dredding@tlg-law.com
*Attorneys for Plaintiff*